No. 95,548

NATIONAL BANK OF ANDOVER, *Appellee/Cross-appellant*, v.
KANSAS BANKERS SURETY COMPANY, *Appellant/Cross-appellee*.

KANSAS BANKERS SURETY COMPANY, *Appellant/Cross-appellee*, v.
NATIONAL BANK OF ANDOVER, *Appellee/Cross-appellant*.

(225 P.3d 707)

Opinion filed March 5, 2010.

*Ann L. Hoover*, of Topeka, argued the cause and was on the briefs for appellant/cross-appellee.

*Richard C. Hite*, of Hite, Fanning & Honeyman L.L.P., of Wichita, argued the cause and was on the briefs for appellee/cross-appellant.

*Stanley R. Parker* and *Deanne Watts Hay*, of Parker & Hay, LLP, of Topeka, were on the brief for *amicus curiae* The Surety & Fidelity Association of America.

The opinion of the court was delivered by

NUSS, J.: This appeal arises out of an employee's unauthorized honoring of insufficient funds checks, which resulted in a loss to

her employer, National Bank of Andover (bank). The bank had obtained a Financial Institution Crime Bond, which its issuer, Kansas Bankers Surety Company (KBS), then sought to rescind via a declaratory judgment action. The bank filed a separate suit and alleged breach of contract by KBS.

The cases were consolidated and tried to a jury. KBS obtained a verdict in its favor, but the trial court granted the bank's motion for a new trial. On retrial, the bank obtained a verdict in its favor. KBS appealed, and the bank cross-appealed. The Court of Appeals panel reversed and remanded for a third trial. This court granted the petition and cross-petition for review. Our jurisdiction is under K.S.A. 20-3018(b) and K.S.A. 60-2101(b).

We have reorganized the issues on appeal, which, along with our holdings, are as follows:

THE BANK'S ISSUES:

1. Did the Court of Appeals panel err in holding that an insurer may rescind a financial institution crime bond whose terms expressly allow rescission for an insured's conduct which is less serious than fraudulent misrepresentation? No.
2. Did the panel err in holding that the phrase "does your bank require" contained in the bond application refers not only to standards of performance but also to actual performance? No.
3. Did the panel err in reversing the trial court's grant of judgment to the bank on KBS's claim that the bank gave an untrue answer to Question 1 of the bond application? No.
4. Did the panel err in holding that employee Steward's transactions can be characterized as bank loans? No.
5. Did KBS show prejudice resulting from the trial court's order in limine and evidentiary rulings? Yes.
6. Did the panel err in reversing and remanding for a third trial? No.

KBS'S ISSUES ON CROSS-APPEAL:

7. Did the panel err in failing to reinstate KBS's favorable jury verdict in the first trial? No.

8. Did the panel err in failing to rule as a matter of law that no coverage exists under Insuring Agreement (A) of the bond? No.
9. Did the panel err in failing to reverse the trial judge's grant of judgment as a matter of law against KBS regarding Question 2 of the bond application? Yes.

Accordingly, we affirm in part and reverse in part the Court of Appeals, reverse the district court, and remand for a third trial.

### FACTS

For years National Bank of Andover had been covered by annual renewals of a Financial Institution Crime Bond through Kansas Bankers Surety Company. On January 11, 2002, the bank submitted its annual application and renewal form for the bond to KBS. The application was filled out by Jo Ann Wallace, the bank's cashier; reviewed by Lane Kvasnicka, the bank's senior vice-president; and signed by Dennis Bush, the bank's president and CEO.

The application provides that it becomes part of the bond upon issuance. The application also addresses an insured's representations to KBS and the grounds for KBS's rescission of the bond:

"THE INSURED REPRESENTS THAT THE INFORMATION FURNISHED IN THIS APPLICATION IS COMPLETE, TRUE AND CORRECT. ANY MISREPRESENTATION, OMISSION, CONCEALMENT OR ANY INCORRECT STATEMENT OF A MATERIAL FACT, IN THIS APPLICATION OR OTHERWISE, SHALL BE GROUNDS FOR THE RESCISSION OF ANY BOND ISSUED OR RENEWED IN RELIANCE UPON SUCH INFORMATION."

Among other things, the application required bank president Bush to answer the following three questions:

"Does EVERYONE employed by the bank know and understand the POLICY AND PROCEDURES as approved by the Board of Directors for their job or department? [Hereinafter referred to as Question 1.]

"Do you have a planned program requiring segregation of duties so that no single transaction can be fully controlled by one person? [Question 2.]

"The correspondent account, suspense account, or transit account is used most often by dishonest employees. Does your bank require that all correspondent accounts, suspense accounts, and transit accounts be balanced regularly and balanced by a second person at least monthly? [Question 3.]"

Bush answered yes to each question. After KBS received the application, it issued the bond on March 15, 2002. One week later, a bank employee discovered suspicious checks in the desk of employee Paula Steward.

Steward was the head accounting clerk at the bank beginning in 1998. From 1999 through the beginning of 2002, Steward paid insufficient funds checks drawn on the accounts of three of the bank's customers: William Spillman, Dr. John Brooks, and Brooks' business, Meadowbrook Farms, Inc. Steward did not charge the paid amounts against the customers' accounts. Rather, she made false entries in the bank records to hide the payments. She paid each of the checks despite the "no pay" instructions given to her by the bank's officers and hid the checks in her desk drawer.

Steward later explained she paid these checks because she was having problems keeping up with her job, things got out of control, and she panicked. She also believed these customers when they told her they would repay the bank for the overdrafts.

On March 27, the bank notified KBS of the problem. The next day, the bank's outside accounting firm, Kennedy and Coe, LLC, began an investigation of the bank's losses. Kennedy and Coe confirmed that Steward had paid insufficient funds checks without charging the three customer accounts even though bank officers had instructed her to return such checks unpaid. The bank's net loss was calculated at nearly $900,000 after customer Spillman refunded the bank for his insufficient funds checks. Kennedy and Coe eventually wrote to inform the bank of "an absence of segregation of duties in regard to return item handling, transit functions and the reconciliations and balancing of both internal general ledger accounts and due from correspondent accounts."

The bank ultimately submitted its sworn proof of loss statement to KBS seeking coverage for the losses on the three accounts. Within a week, KBS vice president Paul Bures began his investigation. He interviewed bank employees and reviewed documents, including the bank's Compliance Policies and Procedures Manual. The Internal Control Policy contained there stated that, among other things, its cashier "shall perform or supervise in the performance of the following" functions:

"5. Reconcile and prove to the general ledger daily:
   a. All deposit accounts . . . .

. . . .
"7. Reconcile and prove to the general ledger monthly:
   a. All correspondent bank accounts."

The job description for Steward's position, head accounting clerk, provides that she reports to the cashier; her purpose is to "assist the Cashier with daily operations and to supervise the bookkeeping department to insure completion of daily operations." Her "duties and responsibilities" include "balancing of General Ledger Accounts" and "Balancing of Correspondent Accounts." Steward confirmed through her testimony that her job included the balancing of the correspondent and general ledger accounts.

Through Bures' investigation, he discovered that Steward was the only bank employee who had been taught to balance the correspondent accounts. He also discovered that before discovery of the losses, correspondent accounts had not been balanced regularly or by a second person on a monthly basis.

KBS president Donald Towle eventually wrote a letter to the bank declaring the bond rescinded *ab initio* because of the bank's false answer to Question 3 on the renewal application. Consequently, Towle returned to the bank its bond premium. Towle later officially amended the basis for KBS's rescission to include the bank's false answers to Questions 1, 2, and 3 on the renewal application.

That same day, KBS filed a declaratory judgment action in Shawnee County District Court. It claimed, among other things, that because the bond was issued in reliance upon the bank's misstatements in its renewal application, KBS "has no contractual obligation to [the bank] under the bond, and the bond is void *ab initio*." The following day, the bank filed a breach of contract action against KBS in Butler County District Court. Consistent with KBS's declaratory judgment action, its defenses included a contention that the contract was void *ab initio* because it was obtained by fraud. The Shawnee County case was transferred to Butler County, and these cases were consolidated.

Both parties moved for summary judgment and for orders in limine. After argument, the trial court denied both summary judgment motions but sustained the bank's motion in limine. It excluded from the trial, among other things, evidence of the failure of the bank's employees to follow the bank's policies relating to their job descriptions and duties. The court found this evidence irrelevant in the declaratory judgment action and reasoned that this evidence would improperly interject issues of comparative fault into a contract action.

The consolidated cases were tried to a jury, which returned a verdict in favor of KBS. The bank filed motions for a new trial and for judgment notwithstanding the verdict. The trial court sustained the motion for a new trial for three reasons. First, the court found that KBS had violated the orders in limine. Second, the court found it had failed to instruct the jury to disregard evidence that employees failed to comply with the bank's policies. Third, the court found there was juror misconduct based upon the affidavits of two jurors, who related that in rendering their verdict they did consider evidence of the bank's poor banking practices and its failure to follow its own procedures.

KBS filed a motion requesting that the trial court reconsider its order in limine and sought additional orders in limine. The bank also filed a motion for additional orders in limine. After hearing arguments, the court denied KBS's motion for reconsideration and granted in part the bank's motion for orders in limine.

A second jury trial was held with quite different results. At the close of the evidence, the trial court granted the bank's motion for judgment as a matter of law on KBS's rescission claims that alleged the bank gave false answers to Questions 1 and 2 on the bond application. The jury then returned a verdict in favor of the bank in the amount of $896,755.35. The trial court denied KBS's motions for new trial and for judgment notwithstanding the verdict. It also later awarded the bank $187,894 in attorney fees, as well as $210,173 in prejudgment interest.

KBS appealed, and the bank cross-appealed. In an unpublished opinion, the Court of Appeals reversed and remanded for a third trial. *National Bank of Andover v. Kansas Bankers Surety Co.*, No.

95,548, unpublished opinion filed April 4, 2008. Among the numerous errors, the panel found that the trial court erred in instructing the jury, in granting some of the bank's motions in limine, and in granting partial judgment as a matter of law.

We granted the bank's petition for review and KBS's cross-petition.

More facts will be added as necessary to the analysis.

## ANALYSIS

### THE BANK'S ISSUES:

*Issue 1: An insurer may rescind a financial institution crime bond whose terms expressly allow rescission for an insured's conduct which is less serious than fraudulent misrepresentation.*

The bank argues that the Court of Appeals panel erred in holding that KBS can rescind the bond by showing that the bank made any incorrect statement in the application, *e.g.,* through negligent misrepresentation. The bank contends that a higher standard than mere negligent misrepresentation is required by the common law.

KBS responds that the application specifically provided that the Bond could be rescinded based on any negligent misrepresentation or omission. Again, the application states:

"THE INSURED REPRESENTS THAT THE INFORMATION FURNISHED IN THIS APPLICATION IS COMPLETE, TRUE AND CORRECT. *ANY* MISREPRESENTATION, OMISSION, CONCEALMENT OR *ANY* INCORRECT STATEMENT OF A MATERIAL FACT, IN THIS APPLICATION OR OTHERWISE, SHALL BE GROUNDS FOR THE RESCISSION OF ANY BOND ISSUED OR RENEWED IN RELIANCE UPON SUCH INFORMATION." (Emphasis added.)

The trial court, however, denied KBS's request to instruct the jury on negligent misrepresentation rather than the higher standards of fraudulent misrepresentation. It instead gave Instruction No. 3, which provides in relevant part:

"[KBS] makes the following claims:

"1. That [the bank] misrepresented, omitted or concealed material facts in its answer of yes to [Question 3] contained within the application for the Financial Institution Crime Bond . . . .

"2. That because of these material misrepresentations or omissions, [KBS] is entitled to rescind the bond and declare it to be void *ab initio* (from the beginning), and thus not pay the claim of the National Bank of Andover;

"3. That the actions of Paula Steward in this case are not covered by the provisions of the bond; and

"4. That the bank has not sustained a loss under the terms of the bond."

More important, the court also gave Jury Instruction No. 4, which identifies the standards for fraudulent misrepresentation:

"In order for the Kansas Bankers Surety Company to be entitled to rescind the bond in this case it must prove that the National Bank of Andover engaged in *fraudulent misrepresentation* with respect to its answer of yes to [Question 3] contained within the application for the Financial Institution Crime Bond . . . .

"A *fraudulent misrepresentation* in the law of insurance is a statement [or statements] by the insured as a fact of something which is untrue, and which the insured states *with the knowledge that it is untrue and with the intent to deceive*, or which it states positively as true without knowing it to be true, and which has a tendency to mislead, where such fact in either case is material to the risk." (Emphasis added.)

In short, KBS argues that Instruction No. 4 erroneously imposes a higher burden than the one imposed by the bond, which provides for rescission simply for "any . . . incorrect statement of a material fact."

*Standard of Review*

This issue arose as a jury instruction question, so the appellate courts must determine whether the trial court erred in failing to give the instructions. "The trial court is required to properly instruct the jury on a party's theory of the case." *Wood v. Groh*, 269 Kan. 420, 423, 7 P.3d 1163 (2000). However, there must be evidence which, viewed in the light most favorable to that party, is sufficient to justify a rational factfinder finding in accordance with that theory. See *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008); *Pizel v. Whalen*, 252 Kan. 384, 388, 845 P.2d 37 (1993) (where reasonable minds might reach different conclusions). Errors do not require reversal unless they prejudice the appealing party. Instructions should be read as a whole, and where they fairly instruct the jury, an error in a single instruction is harmless. 269 Kan. at 423.

This determination requires interpretation of an insurance contract, which is a question of law over which appellate courts have unlimited review. *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, Syl. ¶ 1, 137 P.3d 486 (2006).

*Discussion*

American courts have traditionally taken the view that competent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of fraud, mistake, or duress a party who has entered into such a contract is bound thereby. *Augusta Medical Complex, Inc., v. Blue Cross*, 227 Kan. 469, Syl. ¶ 4, 608 P.2d 890 (1980). It is the duty of courts to sustain the legality of contracts where possible. *In re Estate of Shirk*, 186 Kan. 311, 326, 350 P.2d 1 (1960). Additionally, "[c]ontracts are presumed legal and the burden rests on the party challenging the contract to prove it is illegal. [Citation omitted.]" *Kansas Gas & Electric Co. v. Will Investments, Inc.*, 261 Kan. 125, 129, 928 P.2d 73 (1996). Accordingly, we must determine whether the bond provision allowing for rescission based on an insured bank's conduct which is less serious than fraudulent misrepresentation, *e.g.*, negligent misrepresentation, is illegal or contrary to the public policy of Kansas.

The Court of Appeals panel cited *Scott v. National Reserve Life Ins. Co.*, 143 Kan. 678, 680, 56 P.2d 76, *modified on other grounds* 144 Kan. 224, 58 P.2d 1131 (1936), to suggest that Kansas courts have "consistently recognized that an insurer may not rescind a policy on a mere negligent misrepresentation or omission." Slip op. at 37. But the *Scott* court did not consider whether this construct applies when the parties have specifically contracted for this lesser standard.

Accordingly, the panel ultimately relied upon language in a decision that did somewhat address when parties have specifically contracted for the lesser standards for rescission. In *Van Enterprises, Inc. v. Avemco Ins. Co.*, 231 F. Supp. 2d 1071, 1092 n.15 (D. Kan. 2002), the court acknowledged in a footnote that the insurer might have had a contractual right to rescind the insurance policy based on negligent misrepresentation or omission in a cer-

tain section of the policy. That section stated: "If that information has been materially misrepresented, We have the right to rescind the insurance." 231 F. Supp. 2d at 1079. The *Van Enterprises* court held, however, that because that section had not been included in the contract of insurance, it was of no assistance to the carrier. See 231 F. Supp. 2d at 1092 n.15. By contrast, in the instant case the application clearly states "This APPLICATION shall become a part of your bond." The panel therefore concluded that parties can contract for rescission based upon negligent misrepresentation. Slip op. at 37-39.

The bank argues that the panel ignored other language in the *Van Enterprises* decision, specifically, that which echoes *Scott*:

"Moreover, AVEMCO has not cited a Kansas case which supports the proposition that an insurance policy may be rescinded based on a negligent misrepresentation. Several states have adopted such a rule [citations omitted], but the Kansas Supreme Court cases which address the issue of rescission based on fraud strongly suggest that Kansas does not and would not allow an insurance policy to be rescinded based on mere negligence." 231 F. Supp. 2d at 1090.

The bank's reliance upon this language represents only one of many arguments it makes on this issue in its original and reply briefs in the Court of Appeals, its petition for review and response to KBS's cross-petition, and its briefs to this court. In our view, its strongest contention is that the KBS application provision conflicts with the purported public policy that insurance contracts cannot be rescinded for honest mistakes and the provision is therefore unenforceable. See *House v. American Fam. Mut. Ins. Co.*, 251 Kan. 419, Syl. ¶ 3, 837 P.2d 391 (1992) (Insurance contracts are not enforceable if they conflict with public policy.) In support, the bank claims that *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 809 P.2d 533 (1991), is merely the latest in a "series of cases holding that insurance contracts can be rescinded only for fraudulent misrepresentations and not for mere misstatements. This has been the case even though applications have stated that policies are void or subject to cancellation for mere misstatements. See, *e.g.*, *Waxse v. Reserve Life Ins. Co.*, 248 Kan. at 584."

In *Waxse*, while the provision language is not set forth, the opinion states that the insured completed the insurance application and

"understood that any coverage extended was based upon truthfulness of the application information and that any information discovered untruthful was grounds for rescission." 248 Kan. at 584. The carrier defended a claim for medical benefits after the insured's death by contending it properly rescinded coverage and the contract due to material misrepresentations on the insurance application. The trial court determined that as a matter of law the insured had made a fraudulent misrepresentation and granted the carrier's motion for summary judgment.

This court held that the issue on appeal was "whether the evidence supports the district court's determination that there was a material and fraudulent misrepresentation by [insured] sufficient to support Reserve Life's rescission of the contract." 248 Kan. at 586. After reciting the elements of fraud, this court found "no evidence of fraud," and reversed and granted summary judgment to the insured. 248 Kan. at 588. The opinion contains no discussion of conduct less serious than fraudulent misrepresentation for rescission. We find insufficient language in *Waxse* which would suggest a public policy of voiding an insurer's contracted-for right to rescind for misrepresentations by an insured.

Toward that end, the panel noted that the bank failed to cite any appellate court holding that the parties cannot contract for a rescission provision short of fraud, *e.g.*, a provision "that obviates the need to show knowledge of falsity of the statement and intent to deceive." Slip op. at 38. The bank has not cited any such cases or other authorities to this court. Indeed, K.S.A. 40-2205(C), which admittedly concerns policies of accident and sickness insurance, seems to point us in the opposite direction:

> "The falsity of any material statement in the application for a policy covered by this act may not bar the right to recovery thereunder unless the false statement has actually contributed to the contingency or event on which the policy is to become due and payable: *Provided, however,* that any recovery resulting from the operation of this section shall not bar *the right to render the policy void in accordance with its provisions.*" (Emphasis added.)

Our decision in *American Special Risk Management Corp. v. Cahow*, 286 Kan. 1134, 192 P.3d 614 (2008), provides some additional guidance on the issue of freedom of contract. There, the

insurance company denied the insured bank's claim by excluding coverage due to the bank's failure to disclose certain information in its application. This court agreed. After reviewing the exclusionary language, we concluded that although the exclusion required that the applying bank have knowledge of facts, it did not require that the failure to disclose that information be intentional or reckless. Rather, the bank's failure to disclose the risk could have resulted from negligence; the exclusion would still apply. *Cahow,* 286 Kan. at 1146. We expressly rejected the bank's argument that the exclusion required proof of fraud.

Although there are some parallels between simply excluding a claim from coverage and rescinding the entire contract based upon language in the application, we acknowledged in *Cahow* that they are different actions. 286 Kan. at 1145-46. *Cahow* does provide some limited guidance to the instant case given its treatment of the rescission issue there. The insurance policy "granted the right to void the policy *ab initio* for misrepresentation." 286 Kan. at 1145. The provision stated in relevant part:

"[I]n the event the Application contains misrepresentations made with the actual intent to deceive, *or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Insurer under this Policy,* this Policy shall be void ab initio in its entirety and of no effect whatsoever." (Emphasis added.) 286 Kan. at 1145.

This court held that in order to rescind, "[u]nder the clear language of this provision, Progressive [insurance carrier] would have to establish that the Bank had an intent to deceive, meaning that fraud would have to be established. [Citation omitted.]" 286 Kan. at 1145. While this statement is correct, it is incomplete, as evidenced by the italicized language in the provision. In short, conduct less serious than fraudulent misrepresentation would qualify as grounds for rescission. The *Cahow* court was focused on the bank's argument that the carrier would have to prove fraud to rescind. We then proceeded to explain that the fraud argument was misplaced because the carrier was not attempting to rescind but rather to exclude. Our statement in *Cahow* is therefore clarified: to rescind, the carrier had the option of proving either an intent to deceive, *i.e.,* fraud, or proving misrepresentations that were less

serious than fraudulent but that nevertheless "materially affect either the acceptance of the risk or the hazard assumed by the Insured under this Policy."

We conclude that the panel did not err in holding that insurer KBS may rescind a policy which expressly allows rescission for conduct less serious than fraudulent misrepresentation by its insured bank. Such a contract between these two sophisticated commercial entities does not contravene public policy and is not illegal. It should be enforced as written. *Augusta Medical Complex, Inc.*, 227 Kan. 469, Syl. ¶ 4; *cf. Doctors' Co. v. Drezga*, 218 P.3d 598, 602-04 (Utah 2009) (recognizing insurance carrier's right under the contract to rescind policy for applicant's misrepresentation of any material fact; apparently not limited to fraud). As a result, we agree with the panel that the trial court erred in failing to honor the agreement between the parties and to instruct the jury consistent with the contract. The error is reversible.

*Issue 2: The phrase "does your bank require" contained in the application also refers to actual performance.*

The bank's next argument concerns the meaning of the phrase "does your bank require" contained in Question 3 of the application. As mentioned, Question 3 states:

"The correspondent account, suspense account, or transit account is used most often by dishonest employees. *Does your bank require* that all correspondent accounts, suspense accounts, and transit accounts be balanced regularly and balanced by a second person at least monthly?" (Emphasis added.)

The bank argues that the Court of Appeals panel erred in holding that the phrase meant more than simply having a policy in place. It contends that the definitions of "require" merely relate to standards of performance, not actual performance.

KBS responds that the common and ordinary meaning of "require" includes not only a policy, *i.e.*, the right to demand performance, but also the power to compel or enforce a demand. More specifically, it contends that "require" mandates some level of actual performance in support of the bank policy and that simply creating a procedure is insufficient. KBS cites the present case as evidence: If the bank had actually *required* a second person to

balance the accounts, Steward's policy-violating actions could not have gone undetected for almost 3 years.

The trial court had granted the bank's motion in limine to exclude certain testimony that would have demonstrated that the bank had a policy but did not fully enforce it. For example, Ray Pritchett, an expert retained by KBS, would have testified that according to his investigation—which was based on Kennedy and Coe's external audit findings—bank president Bush was notified prior to 2002 that the bank's "policies regarding reconcilements and segregation and rotation of duties were not being followed."

Pritchett also would have testified that when Steward went on her vacations, no other employee performed the reconcilement function because no one else had been trained to do it. He concluded that, "[f]or the entire time Paula Steward was the head bookkeeper, there was a complete lack of separation and rotation of duties in her area." Pritchett opined that "Paula Steward did nothing to conceal the way she handled the aforementioned checks; they were there for anyone observing bank policy to see."

The trial court ruled this expert testimony was irrelevant because it concerned actual performance by bank employees. In support of the trial court's exclusionary ruling, the bank argued in its brief to the Court of Appeals that

"KBS seems to argue that because something did not happen, [the bank] did not 'require' it. A reasonable construction of the meaning of 'to require,' consistent with its dictionary definition, is to 'have need of' or 'to call on authoritatively.' *Webster's Unabridged Dictionary of the English Language* (2001). On its face the question about balancing of accounts has this meaning when properly construed in its 'plain, ordinary and popular sense' by a 'reasonably prudent insured.' [Citation omitted.] The question asks if [the bank] has a 'requirement' with regard to the balancing of certain accounts, not whether compliance with the requirement is *always* enforced." (Emphasis added.)

The bank elaborated on KBS's position that purportedly mandated perfection, *i.e.*, "required" meant "always follow bank policies." It contended this position reduced the bond to an absurdity because if employees always had to follow the bank policies, there would be no losses and therefore never anything for a bond to actually cover. The panel rejected the bank's argument, holding:

"This argument would have merit if KBS sought to rescind the bond because of isolated and infrequent instances of lapses in adherence to the bank's policies. But here, the thrust of KBS's proffered testimony was a virtual collapse of oversight which was readily apparent to the bank's management. *No fair reading of Question 3 would permit the bank to answer it in the affirmative if Pritchett's observations of the bank's operations are true.* (Emphasis added.) Slip op. at 19.

The panel continued, specifically holding that "require" meant more than the bank's mere issuance of a policy:

"Question 3 was prefaced by the observation that '[t]he correspondent account, suspense account, or transit account is used most often by dishonest employees.' In answering Question 3 it was readily apparent to Bush, an experienced banker, that the purpose of Question 3 was to provide KBS with insight into the risk it was being asked to underwrite in renewing the bond. *In this context, the meaning of the word 'requires' in the question is crystal clear. That meaning could not possibly include the practice of issuing pieces of paper with the word 'Policy' at the top and then ignoring them.*" (Emphasis added.) Slip op. at 19.

*Standard of Review*

This issue arose in the context of an order in limine, which this court typically reviews under an abuse of discretion standard. *Gerhardt v. Harris*, 261 Kan. 1007, 1010, 934 P.2d 976 (1997). Because this court is considering the legal basis for the order in limine, however, review is de novo. See *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006).

The application states: "This APPLICATION shall become a part of your bond." Consequently, several rules of construction should be kept in mind. "The interpretation and legal effect of written instruments are matters of law over which an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect." *City of Arkansas City v. Bruton*, 284 Kan. 815, Syl. ¶ 1, 166 P.3d 992 (2007). "If a written instrument has clear language and can be carried out as written, rules of construction are not necessary." *Bruton*, 284 Kan. 815, Syl. ¶ 3. "[I]f the policy language is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used." *Warner v. Stover*, 283 Kan. 453, 456, 153 P.3d 1245 (2007).

Finally, "[t]he question of whether a written instrument is ambiguous is a question of law subject to de novo review." *Bruton*, 284 Kan. 815, Syl. ¶ 2.

*Discussion*

The bank does not argue that the word "require" is ambiguous. In fact, the bank argues that the question should be looked at in its "plain, ordinary and popular sense" and as it would be interpreted by a "reasonably prudent insured." After setting out dictionary definitions of "require," the bank argues: "Nothing in these definitions requires an applicant for a bond to do more than direct employees to balance the accounts in question before giving an affirmative answer to the question."

KBS, and the *amicus* brief filed by The Surety and Fidelity Association of America (SFAA), disagree. SFAA offers several definitions of the word "require" and, based on those definitions, ultimately contends that Question 3 "does not ask about policies or procedures, it asks whether [the bank] demanded, compelled and/or made mandatory the regular balancing of the . . . accounts <u>and</u> . . . the balancing of those accounts by a second person at least monthly."

In support, SFAA and KBS cite *State v. McCord*, 8 Kan. 232, 1871 WL 765 (1871). There, as in the instant case, the court considered the definition of the word "require." McCord's wife testified voluntarily on behalf of the State in his murder trial. McCord objected, citing a statute that stated in part: " 'That no person on trial or examination, nor wife or husband of such person, *shall be required* to testify, except as a witness on behalf of the person on trial or examination.' " (Emphasis added.) 8 Kan. at 239 (quoting L. 1871, ch. 118, sec. 1). He argued that his wife could not testify without his assent and claimed the word had a technical meaning in law.

The *McCord* court rejected his argument, ruling that "require" was used "in its common and ordinary sense." 8 Kan. at 240. It held: "The proviso is a limitation, not on the competency of the witness, but on the power of the court *to compel such witness to testify*. . . . It does not profess to deal with the competency of the

witness; only with the right of the prosecution to demand that they should testify, *and the power of the court to enforce that demand."* (Emphasis added.) 8 Kan. at 239-40.

The bank responds that SFAA's interpretation of "require" is "unreasonable, unworkable in the real world and self-serving." It quotes from two federal cases considering the definition of "require." Both cases, however, undercut the bank's argument. First, the bank quotes *Scuncio Motors, Inc. v. Subaru of New England*, 555 F. Supp. 1121, 1128 (D. R.I. 1982): "The verb 'to require' usually implies something mandatory, not something which has been negotiated. . . . [I]t suggests the *authority and duty to impose sanctions for noncompliance*, and is not satisfied by a mere request." (Emphasis added by the bank.) The bank also quotes *United States v. John Hendricks, Inc.*, 388 F.2d 677, 679 (7th Cir. 1968), where that court similarly stated: " 'Require' suggests the *authority and duty to impose sanctions for noncompliance* and is not satisfied by a mere request." (Emphasis added by the bank.)

The bank claims that it satisfied both the conditions contained in these definitions: "[The bank] asked and demanded by its authority as an employer that its employees balance the accounts in question. [The bank] had the authority to impose duties and responsibilities on its employees and the power to sanction them for noncompliance." We disagree that the bank satisfied its " '*duty* to impose sanctions for noncompliance' " with its policy. (Emphasis added.) See *John Hendricks, Inc.*, 388 F.2d at 679. We disagree primarily because it apparently never bothered to satisfy the threshold requirement: to simply check for compliance.

This court has looked at the meaning of "require" more recently than *McCord* in 1871. And our definition in *American Media, Inc., v. Home Indemnity Co.*, 232 Kan. 737, 742, 658 P.2d 1015 (1983) is similar to *McCord*'s:

> " 'Require' is defined in Webster's Third International Dictionary as:
> '[T]o ask for authoritatively or *imperatively; . . . insist upon* [usually] with certainty or urgency . . . to impose a *compulsion* or *command* upon . . . .' "
> (Emphasis added.)

In our view, one cannot effectively "insist upon" something without following up to see if it has indeed been performed and then

taking action if it has not. Nor can one truly "impose a compulsion" without some level of enforcement. Otherwise, the bank's policy here is but a paper tiger. As a result, while bank officials may tell employees they are required to follow the policy, there must be some evidence allowed to show whether the officials are doing anything more besides perhaps paying lip service to the policy.

Consequently, KBS's evidence indicating that no bank personnel except Steward were trained to balance the correspondent account is clearly relevant to whether the bank "required" that the correspondent account be balanced by a second person at least monthly. See *State v. Richmond*, 289 Kan. 419, Syl. ¶ 9, 212 P.3d 165 (2009) (relevance only requires a logical connection between the asserted facts and the inferences they are intended to establish); see also K.S.A. 60-401(b) ("'Relevant evidence' means evidence having any tendency in reason to prove any material fact."). Similarly, KBS's evidence indicating that no employee even tried to balance the accounts when Steward was on vacation is clearly relevant to whether the bank required them to be balanced "regularly." This type of evidence was certainly relevant to the bond rescission claim by KBS and to its defense to the breach of contract action by the bank. In short, the panel was correct: The trial court erred in its interpretation of Question 3 and in its resultant exclusion of such testimony.

*Issue 3: The trial court erred in granting the bank judgment on KBS's claim that the bank gave an untrue answer to Question 1.*

The bank's next argument concerns Question 1 of the application. As mentioned, that question asks:

"Does EVERYONE employed by the bank *know and understand* the POLICY AND PROCEDURES as approved by the Board of Directors for their job or department?" (Emphasis added.)

At the close of all the evidence in the second trial, the court had granted the bank's motion for judgment as a matter of law against KBS because there was no "legally sufficient evidence to support [KBS's] rescission" based on the bank's answer to Question 1. The Court of Appeals panel concluded that the trial court's ruling was predicated on the erroneous order in limine which we discussed

in Issue 2. The panel also concluded there was evidence from which a reasonable jury could have reached a verdict for KBS. Slip op. at 30-31.

The bank argues that the panel erred and that fraud must be proved by clear and convincing evidence, which KBS failed to do.

KBS responds that the panel was correct in holding that the trial court's ruling was predicated on its overly broad order in limine. Moreover, KBS was prevented from introducing evidence that the bank gave an untrue answer to Question 1.

### Standard of Review

Appellate courts apply the same standard as trial courts when considering a motion for directed verdict, now known as a judgment as a matter of law under K.S.A. 60-250. See *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007).

" ' "When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict." ' [Citations omitted.]" 285 Kan. at 40.

Stated another way, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). See, *e.g.*, *Smith*, 285 Kan. at 40 ("In other words, a motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party.").

### Discussion

To this court, the bank contends that it was entitled to judgment as a matter of law because KBS did not investigate the truthfulness of the answers in its investigation. The bank cites to the testimony of KBS's Bures that he had not concluded that the bank's employees did not know the policies and procedures relating to their jobs. This testimony, however, does not definitively resolve the issue.

As the panel noted, there was undisputed evidence that at least some of the employees were not aware of all tasks in their job descriptions. Slip op. at 31. As one example, employee Linda Gillet, who had worked in the bank's bookkeeping department, testified that she was never given a job description. As the panel further observed, the trial court also granted judgment as a matter of law based upon its erroneous belief that the correct standard against which KBS's evidence was measured was fraudulent misrepresentation, rather than less serious conduct.

We held in our analysis of Issue 1 that the trial court incorrectly required a higher burden than that contracted for by the parties. Consequently, we hold that the court erred in granting the bank judgment on Question 1 when it utilized the higher burden. When all facts and inferences are resolved in favor of KBS and the correct standard is used, we conclude that reasonable minds could reach different conclusions based on the evidence. See *Smith*, 285 Kan. at 40. The panel was correct in its holding.

*Issue 4: Steward's transactions can be characterized as loans by the bank.*

The bank argues that the Court of Appeals panel erred in holding that Steward's actions constituted bank loans as a matter of law. It contends that her transactions were not loans because an employee can only bind the bank if her actions are authorized.

KBS responds that the honoring of check overdrafts constitutes loans. It also contends that Steward possessed apparent authority to honor the overdrafts and the bank is therefore bound. As a result, there is no coverage for the loan losses under the bond.

We observe that Bond Exclusion 2(e) states there is no coverage for

"loss resulting from . . . any *loan* or transaction involving the Insured [bank] as a lender . . . or extension of credit . . . whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, *except when covered under Insuring Agreements (A)* . . . ." (Emphasis added.)

Consequently, there is interplay with Insuring Agreement (A), *i.e.*, possibly an exception to the loan exclusion in 2(e). Insuring

Agreement (A) appears at p. 2 of the Crime Bond, which states in relevant part:

### "FINANCIAL INSTITUTION CRIME BOND

"The underwriter [KBS], in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriter by the Insured in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

### "INSURING AGREEMENTS
### "FIDELITY

"(A)   Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

"Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or another person or entity.

"*However, if some or all of the Insured's loss results directly or indirectly from Loans,* that portion of the loss is not covered *unless* the Employee was in collusion with one or more parties to the transactions *and* has received, in connection therewith, a financial benefit." (Emphasis added.)

Clearly, the crime bond was not meant to cover the scenarios simply involving bad loans.

Before we merely recite the trial court's specific holding, we note a disagreement between the parties on whether that court decided if the transactions constituted loans. The trial court found: "Although it is true that as between a bank and its customers, the bank's knowing and deliberate coverage of overdrafts does constitute a loan. Such is not what happened here. . . . This was not the bank's decision to cover overdrafts; it was a single employee's criminal act."

KBS interprets this ruling to mean the court determined that the transactions were loans. As a result, KBS argues that because the bank did not deny that the transactions were loans in its summary judgment response, the bank waived the argument by not cross-appealing that ruling. The bank responds that the trial court simply never characterized the transactions as loans.

We need not resolve this dispute because we agree with the panel that the transactions were loans as a matter of law, as more fully explained below.

The panel observed that the bond defines "loan" as "[1] all extensions of credit and [2] all transactions creating a debtor-creditor relationship, and all transactions by which the Insured [bank] assumes an existing debtor or creditor relationship." (Emphasis added.) Similarly, the panel noted that K.S.A. 9-1104(a)(3), part of the Kansas Banking Code, provides that "Loan" is defined as "(A) A bank's direct or indirect advance of funds to or on behalf of a borrower based on an obligation of the borrower to repay the funds; (B) a contractual commitment to advance funds; (C) an overdraft."

These definitions are consistent with other authorities. See, *e.g.,* 12 C.F.R. § 32.2(k)(1)(v) (2009) ("loans or extensions of credit for purposes of 12 U.S.C. § 84 [2006,] and this part include . . . an overdraft, whether or not prearranged"). Many jurisdictions consider that a bank's payment of a customer's overdraft constitutes a loan or an extension of credit. See *Tony's Tortilla Factory v. First Bank*, 857 S.W.2d 580, 584-85 (Tex. App. 1993) (collecting many cases). Indeed, "the common-law rule . . . is that the payment of an overdraft constitutes a loan by the bank to the drawer of the overdraft, a loan for which the drawer is liable." *U.S. Trust Co. of New York v. McSweeney*, 91 A.D.2d 7, 9, 457 N.Y.S.2d 276 (1982).

The bank does not seem to seriously dispute this conclusion on appeal to this court. Rather, it appears to contend that the panel erred in its holding because the transactions could not have been loans since Steward was not authorized to honor the overdrafts.

*Standard of Review*

The determination of what constitutes agency and whether there is competent evidence to prove its existence is a question of law. *Fredricks v. Foltz*, 225 Kan. 663, 670, 594 P.2d 665 (1979); see also *National Farmers Organization v. Kinsley Bank*, 731 F.2d 1464, 1469 (10th Cir. 1984) (indicating that whether an agent has apparent authority to bind its principal is a matter of law). Here, when the trial court held that it was not the bank's decision to

cover overdrafts but a single employee's criminal act, the court essentially held that Steward had no authority that would bind the bank.

*Discussion*

The bank primarily relies on *Bucher & Willis Consulting Engineers v. Smith*, 7 Kan. App. 2d 467, Syl. ¶ 2, 643 P.2d 1156 (1982), to support its argument that Steward could not bind the bank unless her actions honoring the overdrafts were authorized. However, *Smith* does not support the bank's argument. While the court there stated that an agent only binds the principal if the contract is authorized, it went on to explain that principals can be bound by actual or apparent authority:

"A review of the authorities reveals that the apparent authority of an agent to bind the principal rests upon words or conduct of the principal which leads the third party dealing with the agent to reasonably believe the agent's authority is sufficient to cover the transaction in question. In some cases, of course, the words or conduct of the principal are overt and explicit. In other cases, the mere relationship between the agent and principal or the title conferred upon the agent by the principal is sufficient to constitute a representation of some authority." 7 Kan. App. 2d at 470.

The *Smith* court also noted that " '[a]n apparent agent is one who, *with or without authority*, reasonably appears to third persons to be authorized to act as the agent of another.' " (Emphasis added.) 7 Kan. App. 2d at 469. *Smith* does not conclusively establish that Steward had apparent authority to bind the bank; however, it does not support the bank's argument that Steward could not obligate the bank unless her actions were authorized. Instead, *Smith* suggests that Steward could bind the bank if she had apparent authority to do so.

Our court has held that "[a]n ostensible or apparent authority may exist if a principal has intentionally *or by want of ordinary care* induced and permitted third persons to believe a person is his or her agent, even though no authority, either express or implied, has been actually conferred upon the agent." (Emphasis added.) *Shawnee State Bank v. North Olathe Industrial Park, Inc.*, 228 Kan. 231, 237, 613 P.2d 1342 (1980). Here, KBS alleges that at a minimum, the bank failed to exercise ordinary supervisory care

which in turn allowed Steward to honor a number of overdrafts of three different customers for approximately 3 years. We conclude Steward could have readily appeared to these customers to have possessed the overdraft honoring authority.

The bank next suggests that no apparent authority can exist when Steward violated the instructions of bank officers, bank policy, or both. In response, we first return to the standard expressed by the *Shawnee State Bank* court. A bank could be found to have lacked ordinary care by failing to enforce its own policies and officer instructions on overdrafts when it repeatedly allowed overdrafts to be honored and accounts to be unbalanced. Next, we find several other authorities are of guidance.

In *National Farmers Organization v. Kinsley Bank*, 731 F.2d 1464, the Kansas bank argued that its president, who doubled as a loan officer, had no authority to bind the bank to a loan prohibited by statute, *i.e.*, one that exceeded the statutory limit for a bank of that size. After determining that the defense of ultra vires was unavailable to the bank per Kansas statute, see K.S.A. 17-6104, the court looked to the law of apparent authority. Quoting the language set forth above from *Shawnee State Bank*, 228 Kan. at 237, the Tenth Circuit Court of Appeals held that under the circumstances of the case, the president had at least apparent authority to make such loans. 731 F.2d at 1469. The *National Farmers* court observed that, among other things, there was no loan committee, no written procedures for loans, and officers had discretion to decide whether they should discuss particular loans with the board of directors. The Tenth Circuit held that the district court, which ruled as matter of law that the president had authority to bind, did not err in instructing the jury that the bank was liable for his acts. 731 F.2d at 1469.

In *Lincoln Nat'l Bk. & Trust v. Peoples Trust Bk.*, 177 Ind. App. 312, 379 N.E.2d 527 (1978), the bank had an internal rule prohibiting a teller from cashing any check over $500 without manager approval. Nevertheless, a teller cashed an $8,000 check without permission. This action created an overdraft, which the bank covered, and then set off against the depositor's certificate of deposit. The depositor sued claiming, *inter alia*, that the teller violated bank

policy when cashing his check. According to the depositor, the teller created a wrongful overdraft, which led to a wrongful covering of his check by the bank, which in turn led to a wrongful setoff.

The court rejected the depositor's claim which was based upon lack of teller authority. It cited § 4-401 of the Uniform Commercial Code to hold that the check was "properly payable" despite a lack of teller authority. 177 Ind. App. at 315. "When Lincoln [bank] cashed [the check], an overdraft on Wyss' account resulted. Wyss became indebted to Lincoln for the amount of the check. Lincoln had the right to charge the amount to Wyss' other deposits in the bank." 177 Ind. App. at 317. In short, a loan was made, despite bank policy prohibiting its creation.

We acknowledge some distinctions between that case and the instant one. *Lincoln Nat'l* concerns a depositor suing his bank, while we address a bank suing its carrier for breach of obligations under a fidelity crime bond. Nevertheless, there is an important similarity. The internal rule prohibiting the teller from cashing a large check—which created a large overdraft—did not prevent creation of apparent authority and in turn did not prevent creation of a "loan." In *Lincoln Nat'l*, the bank covered the check, and the depositor was liable for repayment. By the same rationale, here loans have been created by an accounting clerk's honoring of overdrafts, despite her violations of bank rules and officer instructions.

Finally, the bank argues that the panel's interpretation renders the concept of fidelity insurance meaningless. We disagree. Not every crime by a bank employee is carried out via a loan to a customer. Additionally, the mere characterization of a transaction as a loan is not the only requirement for exclusion from bond coverage under this provision. Under Insuring Agreement (A), the transaction can still be covered if the employee was acting in collusion with one or more parties to the transactions and received a financial benefit for her role in the scheme.

In conclusion, the panel did not err in its ruling. Steward's actions in honoring the overdrafts, although in violation of bank rules and officer instructions, did not prevent these transactions from being loans. Whether other conditions of exclusion from coverage

for loan losses have been met is addressed in our analysis of KBS's argument in Issue 8.

*Issue 5: KBS showed prejudice resulting from the trial court's order in limine and evidentiary rulings.*

The bank argues that the Court of Appeals panel erred in effectively holding the trial court's evidentiary rulings prejudiced KBS. See *State v. Voyles,* 284 Kan. 239, 252, 160 P.3d 794 (2007) (Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done.); K.S.A. 60-261. The bank appears to first contend that no prejudice can be shown because the KBS claim file, especially investigative parts identified as Exhibit FFF, was never offered for admission into evidence at trial. Second, it contends that KBS then failed to receive court approval of any proffer of the file as purportedly required by K.S.A. 60-405. According to the bank, because KBS never received approval of its proffer, the proffer was not properly before the panel. KBS responds that its proffer was properly made and approved and therefore correctly before the panel.

The panel essentially held that KBS was prejudiced by the trial court's rulings:

"Further, the order in limine *effectively and improperly undercuts KBS's ability to present any defense* to the breach of contract action or to present a case for rescission of the bond. The district court, in effect, barred testimony which goes to the issue of whether the bank made misrepresentations on the renewal application." (Emphasis added.) Slip op. at 19.

*Standard of Review*

K.S.A. 60-405 governs the proffer issue and provides:

"A verdict or finding shall not be set aside, nor judgment or decision based thereon be reversed, by reason of erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

*Discussion*

One purpose of a proffer is to make an adequate record of the evidence to be introduced. *State v. Evans,* 275 Kan. 95, 99, 62 P.3d

220 (2003). This record allows the trial court to make decisions based on the substance of the proposed evidence. It also preserves the issue for appeal and provides the appellate court an adequate record to review when determining whether the trial court erred in excluding the evidence. See, *e.g.*, *Evans,* 275 Kan. at 99. "The standard for a satisfactory proffer of evidence is whether the proffer contains the *substance* of the excluded testimony." *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, 623, 822 P.2d 591 (1991).

In *Evans,* 275 Kan. at 99-100, we observed that formal offers of proof are not necessarily required:

"A formal offer of proof in question and answer form is not required if an adequate record is made in a manner that discloses the evidence sought to be introduced. *Carrick* [*v. McFadden*], 216 Kan. 683, Syl. 3[, 533 P.2d 1249 (1975)]. See *State v. Mays,* 254 Kan. 479, 486, 866 P.2d 1037 (1994) (no formal proffer made on each piece of excluded evidence being challenged; however, court through sidebar conferences and statement of defendant was aware of information to be elicited and reason why information was important to defense); *McGraw v. Sanders Co. Plumbing & Heating, Inc.*, 233 Kan. 766, 770, 667 P.2d 289 (1983) (no formal proffer was made; however, argument on motion in limine and in-court dialogue fully set forth appellant's position)."

In *Evans,* we concluded that after our careful review, an adequate record existed for appellate review of whether the trial court erred in excluding the evidence. We reversed the Court of Appeals and held: "The substance of the evidence [defendant] sought to introduce at trial was sufficiently set forth before the trial court." 275 Kan. at 101.

With these authorities in mind, we have reviewed the numerous record citations provided by both counsel in a matter which covered two jury trials and multiple pleadings and accompanying hearings. We first note that an order in limine was in place prohibiting the admission of a substantial amount of evidence. We also observe that the bank's petition for review cites to the record to establish that at the second trial,

"KBS's counsel identified highlighted portions of documents from Bures's investigation file marked as Exhibit FFF as the portions of the file relied on by Towle in deciding to rescind the Bond as the parts of the claim file she wanted to introduce in her case-in-chief in her rescission claim. *The court reviewed Exhibit FFF and commented that '. . . there are some comments in here that . . . wouldn't be*

*violative of the court's order in limine, but the overwhelming majority of this would.'* " (Emphasis added.)

The bank also contended in its petition for review that "during trial there was an extended discussion of the parts of the claim file developed by Bures which KBS's counsel wanted to introduce to show what Towle relied on in attempting to rescind the Bond." The bank additionally points out that during Towle's testimony he "was asked to identify the portions of the file he relied on in deciding to rescind the Bond. An objection was made because Exhibit FFF had not been admitted into evidence." The bank concludes that "Exhibit FFF was never offered into evidence."

We further observe that during the second jury trial, KBS's counsel and the district judge discussed how proffers would be handled. They particularly addressed whether the proffer procedures from the first trial would be followed:

"MS. HOOVER: . . . I was assuming we were doing it somewhat similar to the other trial. I believe I've indicated, with respect to some of these witnesses, that I do have you know, I want to make a proffer. I don't want to waive the fact that I'm not proffering at the completion of their testimony, my evidence in. I was assuming we would do it somewhat similarly as we did it the last time, in which I could just make the proffers and it wouldn't be considered a waiver of a contemporaneous proffer. I wanted to make sure I got that on the record.

"THE COURT: As far as I'm concerned, *with respect to proffers of evidence that the Court is not going to admit,* you can do that whenever is convenient for you, even when the jury is deliberating, as far as I'm concerned.

"MS. HOOVER: Thank you.

"THE COURT: That's fine." (Emphasis added.)

There was no objection from the bank counsel to this procedure.

Shortly after the case was submitted to the jury, counsel and the court addressed the proffer issue again. The court acknowledged KBS's counsel had earlier indicated that she wanted to proffer the claim file or parts of the file. The judge stated, "I told her she could do that at any appropriate or convenient time. So now would be a good time." The court advised KBS counsel to ask herself, "What were the court's rulings in this case? *What was I not allowed to introduce* in this case that I feel like I should have been allowed to introduce? *And what evidence do I, therefore, want to proffer for use on appeal?*" (Emphasis added.) The court was to later state

that "it's important in this case, *should it go up on appeal*, that the proffered exhibits that *go up on appeal* have some connection to what we did in this particular litigation." (Emphasis added.)

When bank counsel was asked about the possibility of the court simply ruling that "everything that was admitted as a proffered exhibit last time [the first trial] can come in this time as a proffered exhibit," he replied:

"I think that the burden is on Kansas Bankers Surety to make an appropriate proffer in this case. Now, I can sympathize with [KBS's counsel's] problems, and if she needs some additional time to do so, I would not object to that."

In short, the court and counsel clearly agreed that KBS could submit its proffer posttrial.

The absence of any discussion about any KBS failure to initially offer the claim file into evidence demonstrates that both court and counsel essentially regarded this as a nonissue. The bank does not point to any place in the record where its counsel ever objected about any purported KBS failures to formally offer these items for admission into evidence. Nor was any objection raised to the court's effective recognition of KBS's authority to make a proffer. Indeed, bank counsel agreed that KBS counsel should proceed with her proffer and graciously consented to give her additional time. Finally, the court's numerous comments about appeal make it clear its focus was on proffers for appellate purposes. It had no concerns about a lack of formal offers to admit, instructing bank counsel to ask herself: "What was I not allowed to introduce in this case that I feel like I should have been allowed to introduce?" We therefore reject the bank's argument first made to this court that KBS was unable to show prejudice from the trial court's rulings due to KBS's failure to offer the items into evidence at trial.

The bank next argues that KBS never sought "approval of the proffer by the trial court as required by K.S.A. 60-405." According to the bank, KBS failed to make a record which would allow appellate courts to rule on the propriety of the trial court's exclusion from evidence. Consequently, the proffer was not properly before the panel or this court.

As noted, the court and counsel agreed that KBS could submit its proffer posttrial. KBS did so 11 days later via a filed formal pleading partially captioned "Offer of Proof." The lengthy document makes multiple "offers of proof." It provides details on what the full testimony of Bures, Towle, and six other witnesses would have established had they "been permitted to testify on all areas of testimony." It alleges that Towle's testimony "would have established the following reasons why he believed there were grounds to deny the Bank's claim" and "specific reasons to rescind the bond," which it then details in four pages.

The pleading also made a "supplemental offer of proof of exhibits excluded at trial." Among these, and most important to our analysis, were:

"1. Exhibit 'F' and 'H': KBS Claim File with Interview Notes marked separately as Exhibit 'H'.

. . . .

"7. Exhibit 'FFF': Selected portions of KBS claim file (Exhibit F) and all interview notes (Exhibit H) specifically relied upon by Donald Towle to rescind the bond."

The marked exhibits, which contain numerous pages, are attached to the pleading.

During the proffer discussion with counsel while the jury deliberated, the court had repeatedly spoken of the eventual decision of whether "to admit proffered exhibits." In our view, there is no need to "admit" proffered exhibits—especially once the case has been submitted to the jury. The exhibits are being proffered by KBS simply because the trial court had not allowed their admission at trial and KBS desired to build the record on appeal. The trial judge acknowledged as much with his comment about KBS's "proffer for use on appeal." While the bank objected to portions of the posttrial proffer "because of the conclusory statements in the proffer," such an objection does not prevent proffered evidence from inclusion in the record on appeal. The objection itself also becomes part of the record for appellate review.

We further note that even if the record on appeal does not contain the trial court's formal "approval" of the proffer, which the

bank insists is required, the bank points to nothing in the record showing disapproval of the proffer either. The record before us obviously contains the proffered exhibits, however. Their presence strongly suggests some level of approval by the trial court. Moreover, the bank has pointed to nothing in the record on appeal indicating its objection to the exhibits' inclusion there.

In short, the purposes underlying the proffer rule have been met. An adequate record was made of the evidence to be introduced, and the trial judge therefore was well aware of the evidence which it excluded. See *Carrick v. McFadden*, 216 Kan. 683, 688, 533 P.2d 1249 (1975) ("While the proffer might well have been made less broadly, we are not prepared to say it was insufficient under the circumstances of this case."). The record preserves the issue for appeal and provides us with adequate information to review for determining whether the trial court erred in excluding the evidence. From this record, we have been able to conclude that it did err.

We agree with the panel that due to the erroneous in limine orders and evidentiary rulings, KBS showed that it was unable to effectively present its case for bond rescission and any defense to the breach of contract action. When, as here, errors in rulings or orders are of such a nature as to affect the outcome of the trial and deny substantial justice, reversal is required. See *State v. Drayton*, 285 Kan. 689, 702, 175 P.3d 861 (2008); see also K.S.A. 60-261.

*Issue 6: This action should be remanded for a third trial.*

The bank finally argues that because the Court of Appeals erred in its rulings and because those trial court errors the panel did identify failed to prejudice KBS, the bank's favorable verdict from the second trial should be reinstated. This is basically a cumulative error argument.

Because the panel did not err in any of its rulings about which the bank complains, this argument fails. See *State v. Richmond*, 289 Kan. 419, 446, 212 P.3d 165 (2009) (in absence of any error, none can accumulate).

KBS'S ISSUES ON CROSS-APPEAL:

*Issue 7: There is no error for failing to reinstate KBS's favorable verdict in the first trial.*

KBS argues that the Court of Appeals erred in denying KBS's requested reinstatement of its favorable verdict from the first trial due to the trial court's improper consideration of juror affidavits when granting a new trial. While the panel found the trial court had incorrectly considered the affidavits, the panel's refusal to reinstate was based upon KBS's failure to challenge the other two reasons given by the court when it had granted a new trial.

In its cross-petition for review, KBS argues that the panel incorrectly concluded that KBS did not challenge the granting of a new trial based on these alternative bases. KBS claims that it has always challenged the trial court's grant of a new trial on all three grounds. The bank responds that in KBS's appeal from the bank's favorable verdict in the second trial, "KBS contended only that 'the trial court abused its discretion in granting a new trial to [bank] based upon alleged juror misconduct' following the first trial."

As mentioned, the trial court cited three grounds for granting a new trial: (1) juror misconduct, (2) KBS's violations of the order in limine, and (3) failure to instruct the jury to disregard evidence of the failure of bank employees to follow the bank's policies. The panel correctly noted that the latter two grounds were alternative bases for granting a new trial that did not relate to conduct at the trial constituting reversible error, since KBS sustained no prejudice when it obtained a favorable verdict. It also noted:

"[But] to the extent these rulings by the court *became prejudicial in the context of the court's ruling on the motion for a new trial,* KBS had the duty to assert these issues in challenging the court's ruling on the motion. Since KBS does not challenge the granting of a new trial *on these alternative bases,* its challenge to the granting of a new trial fails." (Emphasis added.) Slip op. at 22-23.

### Standard of Review

"The decision to grant or deny a motion for a new trial rests in the sound discretion of the district court. [Citation omitted.]" *State v. Stevens,* 285 Kan. 307, 319, 172 P.3d 570 (2007).

*Discussion*

KBS argues to this court that, although its brief was broadly phrased, the brief contained specific challenges to those other two trial court findings. In KBS's brief to the panel, however, KBS's Issue 4 was merely phrased as: "The trial court abused its discretion in granting a new trial to NBA [bank] based upon alleged juror misconduct." The only reference KBS made to the other two trial court findings for a new trial was in stating the court's holding:

"As a result of NBA's [bank's] power of suggestion, the trial court improperly assumed the jury's discussion of the alleged improper evidence was a result of improper statements by KBS in violation of the order in limine and the extraneous jury discussion affected the jury's verdict."

The most extensive argument KBS made about the other two findings is in its reply to the bank's brief. KBS first stated that the trial court's order in limine was overly broad, KBS's cross-examination of Bush was proper, and KBS witnesses properly testified about the bank employees' failure to follow policies and procedures. KBS then concluded: "KBS did not violate the terms of the Order so as to grant a new trial on the basis of juror misconduct as [the bank] would have this Court believe." We conclude that KBS's reference to the erroneous order in limine clearly only concerns its argument that the trial court erred in granting a new trial based on juror misconduct.

This court has recently affirmed its long-standing rule that an issue not briefed on appeal is deemed waived or abandoned. *Cooke v. Gillespie*, 285 Kan. 748, Syl. ¶ 6, 176 P.3d 144 (2008). Additionally, we have stated that a "point raised only incidentally in a brief but not argued there is deemed abandoned." 285 Kan. 748, Syl. ¶ 6. KBS's fleeting references to two of the three reasons for the trial court's granting of a motion for a new trial are insufficient to preserve the issue for appeal. As a result, we are in no position to hold that the district court abused its discretion in ordering the new trial. See *Stevens*, 285 Kan. at 319. The panel was correct in refusing to reinstate KBS's favorable verdict from the first trial.

*Issue 8: The panel did not err in failing to declare that no coverage exists under Insuring Agreement (A).*

KBS argues that while the Court of Appeals correctly ruled that the transactions were loans, the panel should have gone further and ruled there was no coverage per Insuring Agreement (A) of the bond as a matter of law. The panel instead held that retrial would show if Steward was in collusion with any of the parties to the transactions, a requirement for coverage under Insuring Agreement (A).

Because we agreed with the panel in Issue 4 that the transactions were loans, we proceed to analyze the KBS argument. As mentioned in that earlier analysis, Exclusion 2(e) states there is no coverage for

"loss resulting from . . . any loan or transaction involving the Insured [bank] as a lender . . . or extension of credit . . . whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, *except when covered under Insuring Agreements (A) . . . .*" (Emphasis added.)

Also as mentioned in our earlier analysis, Insuring Agreement (A) in turn states in relevant part that there is coverage for

"(A)   Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
   "Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
      (a) to cause the Insured to sustain such loss, and
      (b) to obtain financial benefit for the Employee or another person or entity.
   *"However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit."* (Emphasis added.)

### Standard of Review

As mentioned, in matters of contract and insurance policy interpretation, our review is de novo. See *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, Syl. ¶ 1, 137 P.3d 486 (2006).

### Discussion

KBS makes a variety of arguments. It first contends that both conditions in the loan loss context—Steward's collusion and receipt

of financial benefit—must be satisfied before coverage of the loss is provided under Insuring Agreement (A). We basically agree. KBS next asserts that in response to KBS's motion for summary judgment, "the bank did not controvert [the condition] that Steward received no financial benefit." It implies that, as a result, summary judgment should have been entered against the bank.

We disagree. Our review of KBS's summary judgment motion reveals no mention whatsoever of whether Steward received benefits. Moreover, we do not even find any mention in KBS's motion of Insuring Agreement (A)—the contractual basis for any allegation that Steward received no financial benefit. Indeed, as the bank points out, that part of KBS's motion on nonrescission grounds was based exclusively upon application of Exclusion 2(e) simply because the transactions were loans. Accordingly, there was nothing for the bank to controvert on the financial benefit issue.

KBS next argues that "there was never any evidence produced that Steward received any benefit"— presumably referring to trial. KBS argues that all bank employees testified in support of this point, but it makes no cites to the voluminous record in support of their testimony. Supreme Court Rule 6.02(d) (2009 Kan. Ct. R. Annot. 38) provides that any material factual statement made without being keyed to the record on appeal by volume and page number "may be presumed to be without support in the record." See *Southwestern Bell Telephone Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1275, 221 P.3d 588 (2009) (" 'It is well-settled that the burden is on a party to designate a record sufficient to present its points to the appellate court and to establish its claims.' ").

KBS does cite to Steward's trial testimony on this issue. But because of KBS's failures to cite to the record concerning the bank employee testimony or any other evidence, we can scarcely rule on all the evidence as a matter of law. In other words, we cannot accept KBS's apparent invitation to reverse the trial court's denial of its motion for judgment notwithstanding the verdict or otherwise overrule that court by considering the amounts of evidence on each side. See *Turner v. Halliburton Co.*, 240 Kan. 1, 6-7, 722 P.2d 1106 (1986) (in reviewing decision on motion for judgment notwithstanding verdict, appellate court required to resolve all facts and

inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied); K.S.A. 60-250.

Finally, KBS attacks the panel's holding on this issue as missing an important point. The panel had specifically held:

> "For KBS to obtain summary judgment, it must establish through uncontroverted evidence not only that the honoring of insufficient funds checks constituted loans to the customer on whose account the checks were drawn, but also that the provisions of Insuring Agreement (A) do not apply. . . . *For purposes of summary judgment KBS had to demonstrate that Steward did not act in collusion with Spillman, Brooks, or Meadowbrook Farms.* In its statement of uncontroverted facts, KBS makes no such assertion. . . . Based upon our de novo review of KBS's summary judgment motion, this omission leads us to conclude that KBS failed to demonstrate that it was entitled to judgment as a matter of law based upon Insuring Agreement (A) and Exclusion 2(e) of the bond." (Emphasis added.) Slip op. at 12-13.

KBS argues the panel unnecessarily focused on the issue of Steward's collusion when lack of Steward's financial benefit alone was sufficient to defeat coverage: "Since Steward received no financial benefit for making the loans in question, there is no coverage for Steward's actions under Insuring Agreement (A), and NBA's claim fails as a matter of law."

The panel may have incorrectly implied that both conditions needed to be unsatisfied. But KBS's complaint to this court about the coverage condition of "no financial benefit" must fail for the reasons given earlier. As a result, on this record, we cannot declare as a matter of law that there was no coverage per Insuring Agreement (A).

*Issue 9: The panel erred in failing to reverse the trial judge's grant of judgment against KBS regarding Question 2.*

For its last argument, KBS contends that the Court of Appeals erred in failing to reverse the trial judge's judgment against KBS regarding Question 2 of the bond application. As mentioned, at the close of all the evidence the bank had argued there was no evidence to justify bond rescission based upon its answers to application Questions 1 and 2. The judge granted the bank's motion for judg-

ment as a matter of law on both questions. In our analysis of Issue 3, we affirmed the panel's reversal of the trial judge on Question 1.

We now address the panel's affirmation of the trial judge on Question 2. As a reminder, the bank answered "yes" to the question: "Do you have a *planned program requiring* segregation of duties so that no single transaction can be fully controlled by one person?" (Emphasis added.) The bank argues that its Internal Control Policy conclusively demonstrates that the bank had programs. It then points out that Question 2 does not particularly inquire into "compliance" with such programs.

In affirming the trial judge's entry of judgment against KBS as a matter of law, the panel first quoted the Internal Control Policy, which states in relevant part:

" 'Our policy is to promote whenever possible a segregation of duties involving incompatible functions. No person shall have control of a transaction from origination to completion. In addition, the following program will provide a secondary review function of all major transactions.' " Slip op. at 31.

The panel then ruled that Question 2, unlike Question 3 (analyzed in Issue 2), was limited to asking whether the bank had policies and procedures in place. It concluded that Question 2 did not ask "whether the bank *required* certain conduct of its employees," *i.e.*, actual performance. Slip op. at 31-32.

*Standard of Review*

As mentioned, appellate courts apply the same standard as trial courts when considering a motion for judgment as a matter of law under K.S.A. 60-250. The court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007). Stated another way, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

*Discussion*

Based upon our standard of review, we essentially ask whether any reasonable jury could have found that the bank did not have any such "planned program *requiring* segregation of duties so that no one single transaction can be fully controlled by one person?" If yes, we must reverse the trial court's judgment and the panel's affirmation. Although a close question, we reverse. The finder of fact must make this ultimate determination.

We note that if the application had simply asked whether the bank applicant had a policy for segregation of duties, the bank here could have easily answered "yes" and clearly been truthful. We also note, however, that if the application had asked "Does your bank require segregation of duties?", then consistent with our ruling in Issue 2 ("Does your bank require that all correspondent accounts . . . be balanced regularly?"), the bank would truthfully have had to answer "no." The negative response would be necessary because the bank failed to insist upon compliance with its policy or program by checking employee performance.

Question 2, however, is between these two points on the continuum. It established three mandatory conditions: (1) "a planned program (2) requiring segregation of duties (3) so that no single transaction can be fully controlled by one person." The phrase "planned program" suggests more than the bank's mere declaration of its "policy to promote whenever possible a segregation of duties involving incompatible functions." The bank accordingly argues that it possessed such a program because following this bank "general policy statement there are four pages listing 'Reconciliation and Control Procedures.' "

We hold that even when such a program exists, *i.e.*, one articulating the steps for the segregation of duties, then the program still must "require" that segregation. As with our discussion in Issue 2, we conclude that the word "require" alone suggests more than merely placing the steps of a financial segregation-of-duties program in a policy manual. "Require" contemplates some minimal

level of attempting to insist upon compliance with those steps. For example, as mentioned previously, Steward's written job description provides that she has the "duty and responsibility" to balance the general ledger accounts and the correspondent accounts. As for the bank's argument based upon its Reconciliation and Control Procedures, we note that they require the cashier—to whom Steward reported, according to Steward's job description—"to perform or supervise in the performance of" a number of tasks. These include "to reconcile and prove to the general ledger monthly . . . all correspondent bank accounts" and to "review general ledger activity monthly for unusual activity." Had the cashier performed these supervisory tasks, she might have been able to perform, or supervise the performance of, some of her other tasks required by the reconciliation and control procedures. Some examples include "on a daily basis, balance overdrafts and unposted items to general ledger, scrutinize for large recurring overdrafts, and report to Board of Directors all inactive overdrafts over $100.00."

Our conclusion about the necessary conditions of a "planned program requiring" segregation of duties is further based upon other bank declarations in its own Internal Control Policy. The policy language cited above by the panel should be viewed in its complete context. The bank's General Policy Statement provides:

"The Board of Directors *shall annually examine this program as to* adequacy and *compliance* or this shall be done by a qualified accounting firm to see that it meets the requirements for National Banks, and the Board *shall approve same.*

"It is the policy of the National Bank of Andover *to conform to sound internal control procedures.* While no system of controls can be considered foolproof, *this compliance will discourage unauthorized and unlawful acts.* In addition, *compliance* will protect our employees from undue suspicion in the event of a questionable transaction.

"Our policy is to promote whenever possible a segregation of duties involving incompatible functions. *No person shall have control of a transaction from origination to completion.* In addition, the following program will provide a secondary review function of all major transactions." (Emphasis added.)

The Internal Control Policy then sets forth the bank's program of review. In addition to the cashier's review duties described earlier, the program's reconciliation and control procedures provide mandatory review and action by higher management:

"Quarterly Reports to the Board of Directors

"The following reports shall be made to the Board of Directors on a quarterly basis:

1. A *review of all Internal Control Procedures and any differences or shortages.*" (Emphasis added.)

Finally, these reconciliation and control procedures provide mandatory review and action by the bank board itself:

"Board of Directors Annual Responsibilities

"The following shall be performed annually by the Board of Directors:

1. A *review of the Internal Control Audit Program and its implementation* for the previous year; and *a determination of its adequacy and approval of the same.*" (Emphasis added.)

Sometime after the discovery of the insufficient funds checks in Steward's desk drawer, the bank's own auditors informed the bank of "an absence of segregation of duties in regard to . . . the reconciliations and balancing of both internal general ledger accounts and due from correspondent accounts." The record is unclear on whether before this occasion the accounting firm had annually examined the bank's internal control "program as to adequacy and compliance," one of the options under the bank's own policy.

The record is more clear, however, that the bank board of directors, among other things, seemingly failed to enforce conformance to, and compliance with, sound internal control procedures; to ensure that no person would have control of a transaction from origination to completion; to receive quarterly reports reviewing internal control procedures; to annually review the internal control audit program and its implementation for the prior year; and to annually determine the adequacy of that program. Finally, the record also demonstrates that because Steward improperly honored insufficient funds checks for 3 years and apparently failed to balance the correspondent accounts and general ledger accounts during that time, the cashier's failure to ensure reconciliation every month could mean that she failed to supervise Steward on a minimum of 36 occasions.

From this evidence, we must conclude that a reasonable jury could find that nothing beyond the bank's publication of its planned program had effectively occurred. See *Smith*, 285 Kan. at 40. In

short, there was no program actually "requiring" segregation or Steward's compliance with program procedures. As a result, the panel incorrectly affirmed the trial judge's grant of judgment as a matter of law against KBS regarding Question 2 of the bond application.

Given our holdings on this appeal, we must reverse the trial court's decision granting attorney fees to the bank under K.S.A. 40-256 (attorney fees may be recovered if insurance company refused without just cause or excuse to pay full amount of loss if "judgment is rendered against any insurance company"). Similarly, the bank's motion for appellate attorney fees under Supreme Court Rule 7.07(b) (2009 Kan. Ct. R. Annot. 61) is denied.

Judgment of the Court of Appeals is affirmed in part and reversed in part. Judgment of the district court is reversed, and the case is remanded for a third trial.

McFARLAND, C.J., and BEIER, J., not participating.

HILL, J., assigned.