NOT DESIGNATED FOR PUBLICATION

No. 118,841

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
L.C.P., B.P., R.K., and H.D.K.,
Minor Children.


MEMORANDUM OPINION


Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed August 24, 2018. Affirmed.


*Rachel I. Hockenbarger*, of Topeka, for appellant.


*Morgan L. Hall*, assistant district attorney, and *Michael F. Kagay*, district attorney, for appellee.


Before MCANANY, P.J., PIERRON, J., and WALKER, S.J.


PER CURIAM: Mother appeals the termination of her parental rights, claiming the district court had insufficient evidence to find she was unfit and termination was in the best interests of L.P., B.P., R.K., and H.K. Finding no errors requiring reversal, we affirm the district court's decision.


FACTS


In 2015, Mother, L.P., B.P., and R.K. moved back to Kansas from Nebraska. Mother was unable to find housing, so she left the children with a family member but without additional items such as money or the legal authority to care for them. The family member contacted the Kansas Department for Children and Families (DCF) because she could no longer care for the children. The State alleged L.P., B.P., and R.K. were children

1

in need of care. The district court ordered the children into temporary custody and later adjudicated them to be children in need of care. At the disposition hearing the court adopted the proposed permanency plan with a goal of reintegration.

Mother gave birth to H.K. in February 2016. She admitted to using drugs in September and October 2016. In November 2016, DCF staff visited Mother at home. She appeared to be under the influence of drugs. Father admitted they both used methamphetamine to work through the night and morning to clean the home. DCF contacted law enforcement and they took H.K. into protective custody because the parents showed "the standard effects of methamphetamine" use.

The State alleged H.K. was a child in need of care. The district court ordered H.K. into temporary custody and later adjudicated H.K. as a child in need of care. The State ultimately moved for findings of unfitness and termination of parental rights for all four children.

Staff from DCF, KVC Health Systems (KVC), Kansas Children's Service League (KCSL), a psychologist, psychotherapist, addiction counselor, and others testified at trial. Ultimately, the district court determined there was clear and convincing evidence to find Mother unfit on several statutory grounds: because her conduct or condition rendered her unable to care properly for the children and this was unlikely to change in the foreseeable future; because her mental illness was of such duration or nature as to render her unable to care for the ongoing physical, mental, and emotional needs of the children; because her use of illegal drugs was of such a duration or nature as to render her unable to care for the ongoing physical, mental, or emotional needs of her children; because of the failure of reasonable efforts made by DCF and KVC to rehabilitate the family; and based on Mother's lack of effort to adjust to her circumstances, conduct, or conditions to meet the needs of the children.

2

Since the children were in extended out-of-home placement, the district court also found Mother unfit because she failed to assure care of the children in her home; failed to maintain regular visitation, contact, or communication with the children; and failed to carry out a reasonable plan approved by the court directed toward the integration of the children into her home.

Mother now appeals the termination of her parental rights to all four children. Additional facts will be added as we discuss each of Mother's contentions on appeal.

ANALYSIS

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008); see *In re X.D.*, 51 Kan. App. 2d 71, 74, 340 P.3d 1230 (2014) (right to be legal parent of child is fundamental right).

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2017 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

3

In any review of the district court's determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The Revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a child in need of care. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2017 Supp. 38-2269(b). The court also must consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

The district court found Mother unfit under K.S.A. 2017 Supp. 38-2269(a), (b)(1), (b)(3), (b)(7), (b)(8), (b)(9), (c)(1), (c)(2), and (c)(3). In relevant part, the statute states:

> "(a) When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future.
> "(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:
> (1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;
> . . . .
> (3) the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;
> . . . .

4

(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

(9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply.

"(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:

(1) Failure to assure care of the child in the parental home when able to do so;

(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 2017 Supp. 38-2269.

Mother does not challenge the district court's findings she is unfit under K.S.A. 2017 Supp. 38-2269(b)(9) and (c)(2). The court found the children were in extended out of home placement as a result of Mother's actions or inactions and Mother failed to maintain regular visitation, contact, or communication, making a finding of unfitness appropriate.

Therefore, we could simply find that these unchallenged district court findings are sufficient to support termination under K.S.A. 2017 Supp. 38-2269(f), affirm the district court, and end this decision right now. This is true because, under our caselaw, we may decline to address the remainder of Mother's challenges to the district court's findings she is unfit. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 280, 225 P.3d 707 (2010) (appellate court may decline to address appellant's challenge to district court's ruling when district court provides alternative bases to support its ultimate ruling on an issue and appellant fails to challenge validity of alternative bases on appeal).

But, in the interest of completeness and in the event of future review, we will proceed to consider Mother's additional complaints about the district court's findings. In doing so, we have reached the conclusion that clear and convincing evidence supports the district court's determination Mother is unfit under K.S.A. 2017 Supp. 38-2269(a), (b)(1), (b)(3), (b)(7), (b)(8), (c)(1), and (c)(3). But each specific area of complaint will be discussed in turn.

*Unfitness due to drug use*

Mother argues the district court erred in finding her unfit because of her drug use. Although admitting she struggles with addiction, she claims she completed regional alcohol and drug assessment center (RADAC) assessments twice, participated in drug treatment, sought out inpatient treatment, had negative drug testing, and that she only stopped treatment because the substance abuse counselor discontinued treatment for seeing a psychologist.

However, clear and convincing evidence in this case supports the district court's findings Mother was unfit because her drug use was of such duration or nature it rendered her unable to care for the ongoing physical, mental, or emotional needs of the children. See K.S.A. 2017 Supp. 38-2269(b)(3).

Under KVC policy, any refused drug test is considered a positive test for drugs. Mother was informed of this policy, but she refused to submit to drug testing on March 17, 2015, and did not submit to additional testing until June 2015. The family moved from Kansas to Nebraska and back in June 2015. Mother left the children with a family member, and there were still concerns of possible drug use. The State took protective custody of the three children. Mother's hair follicle test results in July 2015 were positive for amphetamine and methamphetamine. She entered inpatient treatment in July 2015 but left four days later against medical advice.

While Mother was pregnant with H.K., her drug tests were negative. KVC staff believed Mother was making progress from November 2015 to February 2016, so she was granted two unsupervised home visits with the children near the end of February 2016. H.K. was born in February 2016.

As will be discussed later, KVC stopped Mother's unsupervised in-home visits due to safety concerns with the home. Mother did not submit to drug testing and stopped contacting KVC until May 2016. She apparently passed drug testing and was allowed two supervised parenting visits, then in July KVC allowed her an additional visit. Thereafter, Mother went missing and did not submit to drug tests and did not contact KVC until mid-September 2016, when she admitted to avoiding testing because she was heavily using drugs.

From October 2015 to November 2016, KCSL provided services to Mother. Early into those services, Mother completed a RADAC assessment and no treatment was recommended. However, Mother missed most of her requested drug testing. Mother admitted she was using drugs again in October 2016. KCSL staff required Mother to take an updated RADAC assessment and drug testing. The RADAC assessment was necessary to obtain a referral for drug or alcohol treatment. Mother did not complete the RADAC assessment or submit to new drug testing.

In November 2016, DCF staff visited Mother at home. She was extremely shaky, refused to make eye contact, became agitated very quickly, and refused to submit to drug testing. DCF staff believed Mother was on methamphetamine, and Father later admitted they both used methamphetamine to work through the night and morning to clean the home. At trial, Mother admitted she was "coming down" from methamphetamine. DCF staff contacted law enforcement and they took H.K. into protective custody because Mother showed "the standard effects of methamphetamine" use.

7

Mother did not attend a case planning meeting shortly after H.K. was removed—she was in Shawnee County Jail for traffic violations, pending possession of methamphetamine charges, and a hit-and-run accident. In winter 2016, KVC staff twice scheduled Mother for a RADAC assessment, drove to her house in Willard, Kansas, to take her to the appointments, but she did not go.

Mother did not appear for drug tests in December 2016 or January 2017. She contacted KVC in February 2017, tested positive for marijuana on February 2, and finally completed her RADAC assessment on February 10. Her assessment recommended outpatient treatment.

For about a month, Mother sporadically attended treatment. She met with Thomas Wolfe an addiction counselor at Mirrors, Inc. near the end of February 2017. Wolfe testified Mother attended two individual sessions and four group sessions. She missed nine other sessions and her absence led staff to remove her from their active roster. Wolfe testified Mother's progress was not good because a person not attending treatment rarely achieves sobriety. According to Wolfe, while Mother was meeting with her psychotherapist, he would not have encouraged her to stop attending treatment at Mirrors, Inc. Wolfe did admit he did not take a proactive approach to her treatment while she was meeting with her psychologist. In March, Mother told Wolfe she had returned to daily drug use. In April, Mother stopped treatment and although Wolfe reached out to her, she did not return to treatment. On May 1 she met with Wolfe because he was subpoenaed for trial and needed her authorization to release her records. She admitted her drug addiction was worse and she requested inpatient treatment. At the time of trial, she was not in any treatment.

During her treatment with Wolfe, Mother failed more drug tests than she passed. From February to March 2017, she tested negative for drugs six times, positive for marijuana once, positive for methamphetamines once, and positive for an unspecified

drug once. She did not appear for testing on four separate occasions—per KVC policy those tests were deemed positive. Mother stopped showing up for drug tests in late March and only reappeared to be tested at trial. Any tests she missed in March, April, and May would also be deemed positive for drug use per KVC policy.

KVC staff testified Mother admitted during a trial break that she recently had relapsed. Mother testified she had not used drugs for two or three weeks, but she tested positive for multiple substances, including methamphetamines, at the time of trial. She also testified she was willing to attend inpatient treatment regardless of the trial's outcome. However, the district court gave little weight to the credibility of Mother's testimony because of her verbal and nonverbal responses at trial, conflicting testimony under cross-examination, and the drug test at trial was contrary to her testimony.

When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). Based on the evidence at trial, a rational fact-finder would find it highly probable Mother is unfit. She struggled with drug use since at least July 2015. For nearly two years, her longest known period of sobriety was three months—November 2015 to February 2016. After H.K.'s birth, Mother stopped taking drug tests and had minimal contact with KVC and her other children. Seven months later, she reestablished contact with KVC and admitted she was using drugs again. Two months later, the State placed H.K. into protective custody because of Mother's admitted methamphetamine use. From then until trial, Mother's missed drug tests and positive tests results were greater than her negative test results. For about one month she sporadically participated in treatment but was admittedly using and testing positive for drugs. Weeks before trial she admitted to Wolfe her addiction was getting worse but she was not attending any treatment at the time of trial. Mother testified she had not used drugs in weeks, but she tested positive for multiple substances. She also claimed she was willing to try inpatient

9

treatment, but the district court doubted the credibility of her testimony. Mother now argues Wolfe told her to stop seeking treatment, but according to Wolfe he would never tell her to stop seeking help at Mirrors, Inc.

Clear and convincing evidence supports the district court's finding Mother was unfit because her drug use over the course of two years, and in the months leading up to trial, rendered her unable to care properly for the children, and her drug use was unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). Similarly, a rational fact-finder would find it highly probable her drug use rendered her unable to care for the ongoing physical, mental, or emotional needs of the children. See K.S.A. 2017 Supp. 38-2269(b)(3). Additionally, Mother did not make efforts to adjust her circumstances, conduct, or conditions to meet the needs of the children as she inconsistently attended treatment, but consistently tested positive for drug use. See K.S.A. 2017 Supp. 38-2269(b)(8). Mother's inability to maintain consistent treatment shows Mother failed to carry out the reasonable plan approved by the court directed toward integration of the children into Mother's home. See K.S.A. 2017 Supp. 38-2269(c)(3).

*Mental health issues*

Mother next argues there was no evidence her mental health impacted the well-being of the children or rendered her unable to care for them. She claims she addressed her mental health issues as requested because she obtained mental health evaluations, met with a specialist, took medication, attended some therapy sessions, and could adequately parent with help and treatment. Despite Mother's contentions, clear and convincing evidence exists to support the district court's finding that Mother was unfit due to her mental illness.

In March 2017, psychologist Stephen Hazel met Mother and diagnosed her with adjustment disorder with mixed disturbance of emotions and conduct, anxiety, depression, attention deficit hyperactivity disorder (ADHD), and severe amphetamine substance use disorder. According to Dr. Hazel, Mother had difficulty staying focused, and had hyperactivity and impulsive behaviors. He testified her anxiety hindered her self-confidence to parent and her ADHD negatively impacted her parenting because she became distracted. Dr. Hazel recommended Mother obtain therapy, medication management, abstain from drugs, actively participate in treatment, and remain drug free for at least three to five months before she addressed other parenting issues. Mother did not complete those recommendations.

In February and March 2017, Mother attended three therapy sessions with a psychotherapist at Valeo Behavioral Health Care (Valeo). Mother identified her anxiety was at a 9 out of 10, her impulsivity was a 7 out of 10, and she could focus for 25% of the day. Mother also missed three therapy sessions. Her psychotherapist tried to reschedule the appointments, but Mother did not return the calls or return to therapy. Mother's last appointment was 60 days before trial. At trial, Mother's psychotherapist would not provide a prognosis on Mother's mental health due to the little time Mother spent in therapy.

Also in March 2017, Mother met with medical staff at Valeo. Staff prescribed Mother nonamphetamine-based medications for her ADHD and anxiety with refills for up to three months. Staff scheduled Mother a follow-up appointment on March 31, but she failed to show up. At trial, the district court accepted Mother's proffer she was taking her medication as prescribed. However, she never attended additional appointments and she would have run out of her medication shortly after trial.

A large part of Mother's mental health diagnosis focused on her substance abuse. According to Dr. Hazel, Mother's substance abuse was the "underlying piece" of her

mental health issues. He testified she would be unable to adequately parent unless she consistently attended her substance abuse programs and maintained her sobriety. He noted Mother could not miss meetings or treatment for long periods of time. Moreover, Dr. Hazel testified Mother would have to be sober, involved in treatment, and have clean drug tests for at least three to five months to show she was headed towards recovery; thereafter, she would be able to address other parenting issues. Finally, he testified it would be very difficult for Mother to be stable and a consistent parent if she continued to use drugs.

Mother claims there was no evidence her mental health had an impact on the well-being of the children. Yet according to a visitation supervisor, Mother had difficulty paying attention to her children during supervised visits, she "wasn't able to focus" on all the children, and R.K. was often left to tend to himself. During the visits, B.K. would hit Mother and she would not stop him. The visitation supervisor was forced to intervene and explain to both Mother and child why this behavior and lack of parenting did not benefit the child.

Moreover, Mother testified, "I sought out amphetamines or methamphetamines because it helped me focus, it helped me stay on track, it helped me complete tasks." Her admission is consistent with Dr. Hazel's diagnoses of anxiety and ADHD, her self-reported high levels of anxiety and lack of focus, and the testimony that her lack of focus impacted her parenting during supervised visitation. Thus, the evidence before the district court clearly showed that Mother's unfitness was directly related to her ongoing drug use, which consequentially resulted in failure to address her mental health issues. Her psychological issues, her drug use over the course of two years, her sporadic drug treatment, and her frequent positive drug tests show Mother was not sober, in treatment, or clean for the three to five months she would need to before she could address her other parenting issues.

Under these circumstances, a rational fact-finder would find it highly probable Mother was unable to care properly for the children. Her mental health impacted her focus on parenting and it was unlikely to change in the foreseeable future, since she was not attending therapy and had not made the necessary arrangements to continue her prescription medication. See K.S.A. 2017 Supp. 38-2269(a). Moreover, the record supports a finding of clear and convincing evidence Mother's mental illness was of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the children. See K.S.A. 2017 Supp. 38-2269(b)(1). A rational fact-finder would find it highly probable Mother was unfit because she lacked effort to adjust her circumstances, conduct, or conditions to meet the needs of the children because she was not attending therapy. See K.S.A. 2017 Supp. 38-2269(b)(8). Additionally, Mother's inability to attend therapy supports a finding she was unfit because she failed to carry out the reasonable plan approved by the court directed toward integration of the children into Mother's home. See K.S.A. 2017 Supp. 38-2269(c)(3).

*Housing issues*

Mother next contends that, despite her financial challenges, she routinely took steps to ensure the children received housing and care. She claims she moved to Nebraska to provide a better home for the children, and returned to Willard to provide an adequate home for them. She also argues when she was unable to provide care, she placed the children with other family members.

However, clear and convincing evidence supports the district court's conclusion Mother was unfit for failing to assure care of the children in the parental home when able to do so. See K.S.A. 38-2269(c)(1). Mother and Father moved the children to Nebraska in spring 2015. At trial, Mother admitted she and the children were living in a homeless shelter in Nebraska. Mother testified that after she moved back to Topeka, she and Father were living in a tent next to railroad tracks. Mother placed the children with another

13

family member. According to a DCF social worker, the family member contacted DCF because the family member could no longer afford to take care of the children.

In February 2016, Mother was living in Willard, and DCF set up two unsupervised visits there. According to KVC family support worker Kathy Swank, who was coordinating the home visits, it was cold and the house relied on a wood burning stove to keep warm. The stove had no protections around it to keep the children safe. Swank told Mother and Father they could not leave the children alone because the stove was hot. At the time, R.K. was crawling and learning to be independent. The parents assured Swank they would watch the children.

Upon returning after the visitation was over, Swank was unable to get anyone to answer the door. When Swank walked in, she observed R.K. to be unsupervised in the living room and eating crumbs off the floor. The parents were in bedrooms playing with the other children but were not supervising R.K. At the next visit, there was no fire in the wood burning stove when Swank arrived. Swank told Mother to start a fire for heat, but instead Mother went back to bed until all of the children arrived with another worker. Before leaving, Swank again advised Mother to start a fire. When Swank returned, the fire had not been started and everyone still had on their coats. Because of safety concerns arising out of these unsupervised visits, Mother's visitation was switched to being supervised at the DCF offices.

According to Mother, she moved away from Willard around January 2017. From there, she stayed with her mom for a few days, a friend for a few days, and then moved in with another couple. The couple eventually removed Mother from their home, and Mother tried staying with her aunt. According to Mother, she then relapsed. From then until trial, Mother admitted living on and off with her mom.

The evidence clearly shows Mother did not assure the care of the children when they were in her home. Mother and the children moved to Nebraska and lived in a homeless shelter. They then returned to Kansas and at some point Mother and Father were homeless and living in a tent by the railroad tracks in Topeka. While Mother did leave them in the care of family, the family member was unable to provide care for the children. Mother's best efforts at assuring for their care came when she had her home in Willard. But even then, she failed to provide protection from the wood burning stove on one occasion and on the other, failed to keep the house warm. In the months before trial, Mother's residence was temporary at best.

Given this evidence, a rational fact-finder would find it highly probable Mother was unable to care properly for the children and her lack of suitable housing was unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). From nearly the start of this case, Mother has had issues with providing suitable housing for the children. The evidence supports a finding Mother is unfit because she lacked effort to adjust her housing circumstances or conditions to meet the needs of the children. See K.S.A. 2017 Supp. 38-2269(b)(8). Additionally, the evidence supports finding Mother failed to assure care of the child in the parental home when able to do so. See K.S.A. 2017 Supp. 38-2269(c)(1). Finally, the clear and convincing evidence of her lack of suitable housing supports finding Mother was unfit for failing to carry out the reasonable plan approved by the court directed toward integration of the children into Mother's home. See K.S.A. 2017 Supp. 38-2269(c)(3).

*Reasonable efforts to rehabilitate the family*

Mother next challenges the work provided by DCF and KVC, claiming public and private agencies did not make reasonable efforts to rehabilitate the family; thus, there cannot be a failure of those efforts under K.S.A. 2017 Supp. 38-2269(b)(7). Additionally,

Mother urges this court to change the statutory standard and instead require the agencies to make effective efforts.

K.S.A. 2017 Supp. 38-2269(b)(7) requires public and private agencies make *reasonable* efforts to rehabilitate the family, and when those efforts fail, a finding of parental unfitness is appropriate. As Mother readily acknowledges, agency action does not require an exhaustion of all resources or a "herculean effort." See *In re J.L.*, 116,293, 2017 WL 1832348, at *4 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 987 (2017).

Mother's contention that the statute should be interpreted to require *effective*, rather than reasonable efforts to achieve rehabilitation of the family lacks merit for two reasons. First, it is contrary to the language of the statute itself and our well-developed body of caselaw surrounding what constitutes "reasonable efforts." Second, and equally important, basic logic compels the conclusion that requiring "effective efforts" of public and private agencies would allow parents to easily defeat the purposes of the statute, i.e., the protection and care of children, simply by not cooperating with those agencies.

Here, there is clear and convincing evidence to support DCF and KVC made reasonable efforts to rehabilitate the family. Nicki Unfred from KVC testified KVC held multiple meetings for the family to attempt to help Mother work through her drug, housing, and mental health issues. Unfred testified DCF attempted to give Mother visits with the children once a week if Mother provided negative drug tests for two consecutive weeks. Mother was mostly unable to do so. Mother chose to move to Willard, which made completing her case plans difficult. There was no public transportation between Willard and Topeka. Unfred testified the agency gave gas cards to Mother to drive from Willard to Topeka to participate in drug testing and complete other case plans. Unfred also encouraged Mother to contact her maternal grandmother to request help with

16

transportation. Swank also testified that KVC provided gas cards to Mother for transportation.

Unfred further testified that in February 2016, when Mother was able to provide negative drug tests, DCF gave Mother two unsupervised visits in her home in Willard. Concerns with her Willard home were so serious DCF had to change the visits to supervised at DCF offices.

In October 2016 Mother admitted she was using drugs again, so agency staff required Mother to take an updated RADAC assessment so she could attend treatment. KVC did not allow their employees to transport parents. Despite this policy, Unfred testified she attempted to personally provide transportation for Mother to attend another scheduled RADAC. Unfred knocked on Mother's door for over 15 minutes and when Mother finally answered, she admitted to using drugs. Due to Mother's delay, she missed the RADAC appointment and Unfred rescheduled it. Swank testified she attempted to drive Mother to the next appointment, went to Mother's home in Willard, but no one answered the door.

Throughout this case, Mother frequently failed to communicate with DCF or KVC staff or wholly failed to participate in their efforts to rehabilitate the family. According to Unfred, Mother stopped contacting the agencies in February 2016 and did not reach out again until May 2016. Mother had three supervised parenting visits then went missing. She did not contact KVC again until September 2016. Unfred testified Mother admitted to avoiding the agency because of her heavy drug use. Unfred met with Mother in October 2016, and H.K. was removed in November 2016. Mother did not attend a case planning meeting shortly after H.K. was removed—Mother was in Shawnee County Jail for traffic violations, pending possession of methamphetamine charges, and a hit-and-run accident. Mother contacted KVC again in February 2017 but stopped contacting KVC in March 2017—about two months before trial.

17

At a minimum, Mother had about a two-year struggle with drugs before her parental rights were terminated. To rehabilitate as a parent, she needed to maintain her sobriety and attend treatment. To begin treatment, she needed to complete a RADAC so she could be referred. KVC staff twice scheduled and tried to directly transport her to those assessments. They also provided her with gas cards and other suggestions to complete other case requirements, but Mother's lack of participation in 2016 prevented the three oldest children from being reintegrated. When her drug use was near its height in November 2016, H.K. was removed. Mother sparsely attended treatment in spring 2017 and stopped communicating with KVC and DCF.

The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort. Clear and convincing evidence supports the district court's findings reasonable efforts were made by the agencies to rehabilitate the family, but those efforts were ultimately unsuccessful. See K.S.A. 38-2269(b)(7).

*Alleged abuse of discretion in terminating Mother's rights*

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the children; its judgment will not be disturbed absent an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). "A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

Mother argues the district court erred in finding it was in the best interests of the children to terminate her rights because the court did not give adequate weight to the needs of the love and bonding she had with the children when balancing the rights of children, the State, and Mother. She also asserts her fundamental liberty interest in exercising the care, custody, and control of the children and cites to *In re L.B.*, 42 Kan. App. 2d 837, 841, 217 P.3d 1004 (2009), to argue the district court did not properly apply a balancing test to determine whose interests—the State's, the children's, or Mother's—trumps the others.

However, *In re L.B.* held the balancing test applies to whether to grant untimely appeal of the prior temporary custody orders and findings the child was in need of care. 42 Kan. App. 2d at 842-44. Moreover, this court has previously noted the appropriate standard of review for whether parental rights termination is in the child's best interests is no longer the clear and convincing standard used in *In re L.B.*, but is the abuse of discretion standard. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2.

The district court concluded under K.S.A. 2017 Supp. 38-2269(a) that Mother's conduct and conditions were unlikely to change in the foreseeable future and it was:

> "imperative these children find permanence in a nurturing and stable home providing
> them with structure, guidance, love, support and medical/psychological treatment. Those
> needs can best be provided by parents or parental figures who place the children's needs
> above their own. This Court finds it is in the children's best interests to terminate the
> parental rights of Mother and Father because they are not now, nor will ever be, capable
> of providing the level of care sufficient for their emotional, physical and psychological
> health."

Based on the evidence presented, Mother was using drugs consistently over the past two years, tested positive for drugs at trial, was not attending treatment, and had not done so for over 30 days. Additionally, her mental health prevented her from focusing on

19

parenting the children, but she was not attending counseling and did not follow up for additional medication. Finally, her housing was best when she lived in Willard but still inappropriate for the children because of the issues with the wood burning stove. Living in Willard made it difficult for her to travel and complete her plan requirements. After moving away from Willard, she had no stable housing.

Here, it is clear the district court did not abuse its discretion. The district court gave primary consideration to the physical, mental, and emotional needs of the children. See K.S.A. 2017 Supp. 38-2269(g)(1). A reasonable person could agree Mother's parental rights should be terminated. We find no abuse of discretion, and thus the district court did not err.

Affirmed.