NOT DESIGNATED FOR PUBLICATION

No. 119,217

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.Z. and P.Z.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed February 15, 2019. Affirmed.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Overland Park, for appellants mother and father.

*Daniel G. Obermeier*, assistant district attorney, and *Marc A. Dupree Sr.*, district attorney, for appellee.

Before MALONE, P.J., BUSER and STANDRIDGE, JJ.

PER CURIAM:  This is an appeal of the district court's order terminating the parental rights of Mother and Father to their children, A.Z. (age 17) and P.Z. (age 15). The district court found by clear and convincing evidence that the parents were unfit by reason of conduct or condition which rendered them unable to care for their children, and that this conduct or condition was unlikely to change in the foreseeable future. The district court also found that termination was in the best interests of the children.

Upon our review of the parties' appellate briefs and the record on appeal, we conclude the district court did not error in its order of termination. Accordingly, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father have two sons, A.Z. and P.Z. Their daughter, E.C., was initially part of the proceedings, but when she turned 18 years of age she was dismissed from the case. As a result, this appeal only concerns A.Z. and P.Z., although it should be noted that A.Z. will turn 18 in February 2019.

On January 26, 2016, the Department for Children and Families (DCF) received a report that Father struck P.Z. on the head with a computer keyboard after Father became angry. The next day, DCF received another report that Mother and Father physically neglected the children. The report identified safety hazards in the mobile home, including broken windows and holes in the floor. There were also hygiene concerns.

The children were placed in protective custody. During a law enforcement interview, P.Z. confirmed that his Father had struck him with a keyboard, although he said this was an isolated incident. P.Z. complained that his parents would secure the refrigerator with a chain. He related that the children did not have sufficient food to eat because the family was on food stamps and there was not much money. P.Z. also informed officers that sections of the home did not have power, and the furnace and washing machine were broken.

During A.Z.'s interview, he denied that his parents were treating the children badly. According to A.Z., the children took baths every two days, and A.Z. and P.Z. were often required to take showers together to conserve hot water. A.Z. explained that the refrigerator was locked because P.Z. used to eat snacks during the night. A.Z. stated that the children had enough to eat. He indicated that he was diagnosed with attention deficit/hyperactivity disorder (ADHD) and is in special education classes at school. He does not take any medication for ADHD, however, due to an allergic reaction.

2

E.C. told the officers that Father has "'the world's shortest temper.'" She confirmed that Mother and Father locked the refrigerator because P.Z. would eat food during the night. E.C. stated that she bathed every other day. An inspection of the home by a building code inspector resulted in the mobile home being condemned due to safety hazards.

The State initiated child in need of care (CINC) proceedings. On March 3, 2016, Mother and Father stipulated that the children were in need of care because: (1) the home was unsafe, (2) the children had hygiene issues, and (3) the children had a previous CINC case.

The district court placed the children in DCF custody and established a reintegration plan for the parents. The plan required the parents to maintain safe housing and stable income, contact the court services officer (CSO) once a month, sign necessary releases of information, successfully complete parenting classes, participate in psychological evaluations and mental health services, and provide supervised visits at the Kaw Valley Center (KVC).

The district court continued to evaluate the parents over the course of a year and a half, with little improvement in the condition of the home. At one hearing, the district court noted that while there was some progress in making the home structurally sound, there was still filth, mold, and hoarding within the home. In fact, the district court opined that the interior of the home appeared worse than when the proceedings were initiated. The district court warned that it would direct the State to file a motion to terminate parental rights if there was no improvement in the home at the next review hearing.

At the next review hearing, the district court noted that lack of income and Father's mental health were limiting factors, and the safety and cleanliness of the home would not change unless the parents addressed their emotional and relationship issues. While the

3

district court indicated that it wanted to give the parents every opportunity to regain custody of their children, the court believed the parents were erroneously blaming their lack of progress on their circumstances rather than a lack of effort to make the appropriate improvements.

On May 15, 2017, more than one year after the parents stipulated that their children were in need of care, the State filed a motion to terminate parental rights. In its motion, the State acknowledged that Mother provided the necessary releases, completed her psychological assessment and evaluation, and attended parenting classes and unsupervised visitation sessions as required. She also provided some verification of stable income. However, the State asserted that Mother failed to maintain contact with the CSO and failed to provide verification of safe housing. The State indicated that it provided Mother with resources to assist in fixing the home, but no progress had been made, and Mother refused to search for alternative housing.

Similarly, the State admitted that Father signed all necessary releases, completed parenting classes (without verification), completed his psychological evaluation and assessment, and attended unsupervised visitation sessions as required. On the other hand, Father failed to provide verification of income due to unemployment and disability, failed to maintain contact with the CSO, and failed to provide verification of safe housing.

Given that Mother and Father had more than a year to make the appropriate improvements, in its motion to terminate the State contended the parents were unfit because there had been a failure of reasonable efforts by appropriate public child care agencies to rehabilitate the family, the parents demonstrated a lack of effort to adjust their circumstances, and the parents failed to carry out a reasonable plan towards reintegration.

The termination hearing was held on July 11, 2017, and July 26, 2017. At the hearing, Charissa Boldridge, the family's CSO for the past 16 months, testified that

4

Mother and Father were attending visitations with the children, but these occurred off-site due to the home's unsuitable condition. According to Boldridge, Mother provided pay stubs, but Father had only recently become employed for the first time since the beginning of the case. Although Mother and Father signed all necessary release forms, they failed to maintain contact with Boldridge each month. Boldridge stated that Mother and Father completed all psychological evaluations, assessments, and parenting classes. Mother participated in family therapy as required; however, Father failed to participate in a required mental health evaluation.

Boldridge had not personally assessed the condition of the home but had learned about it from another CSO. Upon learning that the home was unfit, on at least five occasions she provided the parents with community resources to move to a new apartment, obtain Section 8 housing, or renovate the home. The parents wanted to occupy the mobile home, however, because the rent was cheap, and they thought no one would help them bring the mobile home up to code.

Boldridge was aware that Mother and Father intended to use their income tax refund to improve the condition of the home, but she did not know if the parents actually applied the refund to home improvements. She testified Father's progress in fixing the home was slow because he was waiting for help from members of the community. Father told Boldridge that he hung sheetrock, fixed the air conditioner and furnace, and installed doors on the children's bedrooms.

Boldridge testified the parents had reached out to some community resource providers with no success. According to Boldridge, the parents had access to other community resource providers through a KVC portal which identified resources for remodeling the interior of the mobile home. Boldridge opined that the only matters preventing reintegration were the unsanitary living conditions and the parents' mental health issues. She acknowledged that the home was structurally sound and passed a

5

building inspection in 2017, but she did not believe the inspection related to whether the interior of the home was sanitary.

Rachel Bazille, a KVC permanency case manager, also testified. Bazille stated she was assigned as the case manager about one month prior to the termination hearing and her responsibility was to help reintegrate the children back into the home. Bazille testified about her concerns regarding Mother and Father's ability to care for A.Z. and P.Z. given that the children have special needs and the parents are low functioning. Specifically, she noted P.Z. had been stealing from people. In fact, Mother and Father had expressed concern to Bazille that P.Z. was on a path towards jail.

Bazille confirmed that Mother and Father had access to the KVC portal to identify community resource providers but that access was closed because of the parents' lack of communication and overwhelming needs. Bazille testified that all visitations with the children were unsupervised and occurred at the KVC office due to the unsafe housing condition. Bazille indicated that she had scheduled walk-throughs of the home but Mother rescheduled them a few times because she needed more time to clean and declutter the home. Father also needed to put the children's beds together.

Bazille conducted a walk-though inspection of the home a couple weeks after the initially scheduled meeting. She observed clutter and filth in the parents' bedroom. Bazille was unable to walk through the bedroom due to the amount of junk, broken items, and dirty clothes. Mother and Father slept on the couch in the living room because there was too much clutter in their bedroom.

In the bathroom, Bazille observed mold or dirt in the bathtub and toilet, and the walls were covered in unknown substances. In the kitchen, there were dirty dishes and electrical cords laying everywhere. The refrigerator smelled, had rotten and dried food in it, and needed to be wiped clean. Exposed electrical cords were coming in through a hole

6

above the washer and dryer. There was trash and an overwhelming odor throughout the house. Mother told Bazille that she cleaned the house once a week.

In the boys' bedroom, the beds were new but there were holes in the walls with exposed pipes. In E.C.'s bedroom, there was dirt visible on the carpet and the dog cage had a hole where the dog attempted to break through the wires. Bazille testified that the family had three pets and the pets had fleas.

When Bazille asked Mother about the conditions inside the home, Mother replied that she thought it was safe to live there. Bazille opined that the parents had not made much progress based on her observations of the home and she did not think they understood why it was unlivable. Bazille testified that the parents' behavior probably would not change unless their mental health conditions were addressed.

Bazille did not know of any other assistance available that could have been offered to help the parents successfully reintegrate with the children. She did not offer any resources to help them with cleaning the home because she thought that goal was straightforward. Bazille testified that to complete reintegration Mother and Father needed to make their home sanitary and Father needed to complete his mental health services. Finally, Bazille expressed her concern about the children injuring themselves or becoming ill due to the unsanitary conditions and clutter in the home.

Mother testified at the termination hearing. According to her, the only reintegration goal that she had not completed related to the condition of the home. Mother stated that she and Father repaired the floors and walls and eliminated considerable clutter. According to her, they scrubbed everything and put flea collars on all the animals. Mother testified that her bedroom was still filled with clutter because she was only concerned with cleaning the areas where the children went and only did as much as KVC requested.

7

Mother testified that KVC made multiple promises for assistance to no avail. When the parents contacted a provider through the KVC portal, he came to the home and told them that he could repair some things. However, Mother and Father never heard back from the provider, and the caseworker told them it was no longer an option. Mother also contacted Habitat for Humanity, but the organization could not assist the parents because it does not work on mobile homes. Mother also testified that she and Father attempted to rent a new apartment, but they were put on a four-year waiting list.

Mother did not believe the clutter in her home posed any danger to the children and stated that the parents made a lot of progress since the beginning of the case. Some of their income tax refund went to pay for home repairs. Mother claimed that she asked for clarification on what needed to be improved within the home, but KVC caseworkers would not tell her a second time. According to Mother, she cleaned the refrigerator, microwave, and floors and submitted pictures to the CSO, but these pictures were not in evidence at the hearing. She disputed that the home was in as bad a condition as KVC thought and testified there was not any mold or bad odors in the home. Mother testified that although both parents were working, they did everything KVC requested in order to get the house ready for inspection. She also stated the parents were attempting to get A.Z.'s anger issues and P.Z.'s stealing issues under control. Father did not testify.

At the conclusion of the hearing, the district court found that Mother and Father's parental rights should be terminated due to the following three factors under K.S.A. 2017 Supp. 38-2269(b)(7), (b)(8), and (c)(3): failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child; and failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home. Finally, the district court found the parents were presumed unfit under K.S.A. 2017 Supp. 38-2271(a)(5) and in a manner provided by K.S.A. 60-414(a).

8

In particular, the district court found that Father failed to earn income throughout the case, and he did not complete his mental health evaluation form. Additionally, Mother's income verification was sporadic, and both Mother and Father failed to maintain contact with the CSO.

The district court emphasized that the most important issue was housing. Based on the photos of the home from the walk-through inspection, the district court did not believe the home was habitable for human beings, let alone children. Noting that the case was a year-and-a-half old, the district court found that caseworkers gave Mother and Father sufficient time to have the home safe and clean, and even rescheduled the walk-through a few times at the parents' request.

The district judge stated that he shuddered at the thought of terminating parental rights due to uncleanliness and while his decision did not depend on his personal standards of cleanliness, he did not think that anyone would consider the condition of the home as an acceptable way to live. The district court recalled that the parents were told at the previous hearing that having the home structurally sound was important, but that it also needed to be in a livable condition. The district court concluded that KVC had exhausted its options trying to help the family. While the district court surmised that the parents were fully capable of improving their living conditions, they never accomplished this goal.

The district court ruled that the parents' condition was unlikely to change in the foreseeable future because: (1) reasonable efforts made by appropriate public or private child caring agencies were unable to rehabilitate the family; (2) there was a lack of effort by the parents to adjust the parent's circumstances, conduct, or conditions to meet the needs of the children; and (3) the parents failed to carry out a reasonable plan approved by the court directed toward the reintegration of the children into the home. The parents were also presumed unfit under K.S.A. 2017 Supp. 38-2271(a)(5) and in a manner

9

provided by K.S.A. 60-414(a). Finally, the district court concluded that termination was in the best interests of the children given their physical, mental, and emotional needs.

Mother and Father appeal the adverse judgment terminating their parental rights to A.Z. and P.Z.

ANALYSIS

On appeal, Mother and Father contend the district court's finding that they were unfit and their unfitness was unlikely to change in the foreseeable future was not supported by clear and convincing evidence. Additionally, Mother and Father argue that the district court abused its discretion by concluding that termination of parental rights was in the children's best interests. In response, the State highlights the evidence presented at the termination hearing which supported the district court's termination order.

Before terminating parental rights, the district court must find that the State proved by clear and convincing evidence that the parent is unfit and the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). The district court must also find by a preponderance of evidence that termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1).

In reviewing a district court's decision regarding unfitness and unlikeliness to change, an appellate court must consider whether, after review of all the evidence viewed in the light most favorable to the State, it is convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the parent is unfit and the conduct rendering the parent unfit is unlikely to change in the foreseeable future. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing

10

evidence is an "intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691.

Of note, in our appellate review, we do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. Finally, we review the district court's decision regarding the best interests of the child for an abuse of discretion. *In re M.H.*, 50 Kan. App. 2d 1162, 1175, 337 P.3d 711 (2014).

The Revised Kansas Code for Care of Children allows a district court to terminate parental rights upon certain findings after a child has been adjudicated a child in need of care. K.S.A. 2017 Supp. 38-2269(a). Ordinarily, the district court evaluates whether a parent is unfit by considering a nonexclusive list of factors set forth in K.S.A. 2017 Supp. 38-2269(b) and (c). Any one of the factors standing alone may—but does not necessarily—provide sufficient grounds for termination. K.S.A. 2017 Supp. 38-2269(f).

In this case, the district court relied on the following three statutory factors to find Mother and Father unfit:

- reasonable efforts by appropriate public or private child caring agencies have been unable to rehabilitate the family, K.S.A. 2017 Supp. 38-2269(b)(7);
- lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 2017 Supp. 38-2269(b)(8); and
- failed to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home, K.S.A. 2017 Supp. 38-2269(c)(3).

11

In addition, the district court found a statutory presumption of unfitness as described in K.S.A. 2017 Supp. 38-2271(a)(5) and in a manner provided in K.S.A. 60-414(a). This presumption applies when the child has been in an out-of-home placement under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home.

On appeal, Mother and Father present arguments contesting the district court's adverse findings regarding the first two factors, K.S.A. 2017 Supp. 38-2269(b)(7) and (b)(8). However, the parents do not reference the third factor, K.S.A. 2017 Supp. 38-2269(c)(3), which the district court also found established parental unfitness. The parents also do not contest the presumption of unfitness found by the district court. Generally, issues not adequately briefed or presented are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018).

More importantly, when a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of *both* alternatives, an appellate court may decline to address the appellant's challenge to the district court's ruling. *National Bank of Andover v. Kansas Bankers Surety Co*., 290 Kan. 247, 280, 225 P.3d 707 (2010). Given the importance of the subject matter and the closely related factual findings that undergird the three statutory factors supporting the district court's termination order, however, we will individually review Mother and Father's challenge to the termination ruling based on the two statutory factors they have briefed.

*Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, K.S.A. 2017 Supp. 38-2269(b)(7)*

Mother and Father challenge the reasonableness of the efforts made by the various service providers in their attempt to make the home habitable and safe. The State responds that considerable efforts were made to no avail by service providers over the course of 18 months.

K.S.A. 2017 Supp. 38-2269(b)(7) provides that when determining the fitness of a parent, one of the factors the court may consider is the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." The statute focuses on *reasonable* efforts expended by service providers in an effort to achieve the goal of rehabilitation. As our court has observed on a prior occasion, this factor does not "require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan." *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion). It also does not require the public or private agencies to provide every possible resource to the family; only that the agencies made a reasonable effort. *In re A.J.S.*, No. 95,283, 2006 WL 2043504, at *3 (Kan. App. 2006) (unpublished opinion).

At the inception of the proceedings, the parents stipulated that their home was unsafe. In an effort to remedy that condition, the case plan required the parents to maintain safe housing. At the termination hearing, the district court concluded "what we have here is an [unlivable] house that we have exhausted—KVC went through ways in trying to help them." The district court also noted that it had ordered psychological evaluations to determine if there was "something psychologically about these parents that make them incapable of recognizing [unlivable] conditions or doing anything about them if they do recognize." The district court concluded that the parents had no psychological impairments but "[t]hese people are incapable of doing the things they need to do."

13

The record contains numerous instances wherein various social services were made available to help in remedying the unsafe and uninhabitable condition of the home. Boldridge testified that she provided the parents on multiple occasions with community resources to move to a new apartment, obtain Section 8 housing, or renovate the mobile home. Mother and Father counter that while KVC provided them with some resources, those resources were either not available at the necessary time or they did not provide the type of assistance the parents needed. However, Boldridge testified the parents were not amenable to using the provided resources. For example, while Mother testified that she called about a new apartment, there was also testimony that the parents did not want to move. The parents liked the inexpensive rent and were adamant that they wanted to live in the mobile home.

In addition, Boldridge provided both parents access to other community resource providers to facilitate the repair of the home's interior through a KVC portal. Mother and Father complain that they contacted a resource through this portal, and while a man came to the home and said he could fix certain things, he never returned. Subsequently, a caseworker advised Mother and Father that the portal was no longer an option. According to Boldridge, Mother and Father acknowledged contacting some community resources, but they did not succeed in obtaining the necessary assistance. In the end, Boldridge testified that access to the KVC portal was discontinued due to Mother and Father's lack of communication.

Upon our consideration of K.S.A. 2017 Supp. 38-2269(b)(7), and a review of all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found by clear and convincing evidence that Mother and Father were unfit due to the inability of appropriate public and private child care agencies to rehabilitate the family. The parents had access to community resources and ample time to make the necessary improvements in the safety and habitability of the home. In this regard, the efforts of the agencies were reasonable but, as the district court found, Mother

14

and Father were "incapable of doing the things they need to do." As a consequence, the home remained uninhabitable.

*Lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 2017 Supp. 38-2269(b)(8)*

Mother and Father also contend the district court erred in finding that they lacked effort to adjust their circumstances, conduct, or conditions to meet the needs of the children. The parents assert they made a significant amount of progress by bringing the mobile home up to code, removing clutter, replacing the furnace and air conditioner, repairing floors and walls, and cleaning the interior of the home. They claim the home is livable.

Conversely, the State asserts the parents had 18 months to make their home safe and habitable yet the latest home inspection revealed their efforts were lacking. Although Mother and Father were provided with reasonable resources to complete reintegration, they were unable to provide safe, livable housing for the children.

K.S.A. 2017 Supp. 38-2269(b)(8) provides that when determining the fitness of a parent, one of the factors the court may consider is the lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

The district court provided lengthy and thorough findings with regard to the lack of effort made by the parents to provide their children with a safe and livable home. Critical to the district court's legal conclusion that the parents were unfit on the basis of K.S.A. 2017 Supp. 38-2269(b)(8) was Bazille's testimony about her home inspection on July 3, 2017—about three weeks prior to the termination hearing—when Bazille

conducted a rescheduled walk-through of the home. Bazille took photographs memorializing her findings that the home was unsafe and unlivable.

In particular, the inspection revealed exposed wiring in the boys' bedroom and clutter in the parents' bedroom. Bazille was unable to walk through the parents' bedroom due to the quantity of junk, broken items, and dirty clothes. She observed mold or dirt in the bathtub and toilet. The bathroom walls were covered with unknown substances. The kitchen had dirty dishes and cords everywhere. The refrigerator smelled, had rotten and dried food inside it, and the interior needed to be cleaned. Bazille also noted her concern about the pets having fleas. According to Bazille, Mother told her that she cleaned the home once a week and at the time of the inspection she believed it was in a safe, livable condition.

Pictures of the interior of the home were admitted in evidence as State's Exhibits 1 through 20. As explained by the district judge, "I don't believe that there is anybody of a reasonable mind that would believe that the environment presented in State's Exhibits 1 through 20 is habitable by any humans, let alone children."

In particular, the district court recalled Mother's testimony was "'[t]here's not— there's never been mold in my house.' And the pictures of the bathroom and of the front door and of the walls clearly show mold." The district court also highlighted State's Exhibit 8, a photograph of the kitchen counter which had pots and pans, plates, food containers, and other items (including electrical cords) piled on top of each other both in and around the sink and counter.

The district court observed, "That's what the kitchen looks like after being given a week and a half [notice] that somebody is coming out. What does that look like when nobody is coming out?" The district court also noted a photograph of the bottom interior of the refrigerator which showed liquid spillage and what appears to be mildew or mold.

16

Finally, the district court emphasized State's Exhibit 1 which depicted considerable clutter and some trash throughout the parents' bedroom with little floor space in which to walk.

The district court recalled that the parents had rescheduled the walk-through inspection on two occasions. Ultimately, the inspection occurred almost two weeks after the original agreed-upon date. The district court recalled, "Ms. Bazille's testimony was clear that the parents were presenting this as the final product, 'This is how we have prepared our house for the return of our children. We now believe that it is appropriate.'" The district judge continued:

"And the fact that mom—and again, I need to say this. Ms. Bazille was clear in her testimony that when mom had her do this walk-through, this was . . . in their opinion, that the house had been brought up to livable conditions.

"And my accuracy in this, my correctness, is going to stand and fall on State's Exhibits 1 through 20. If somebody can look through those and say that that is not unlivable conditions after a year and a half, then they're going to find out—find that I was incorrect. But I just can't imagine. I looked through 1 through 20, and I don't believe that anybody—a reasonable person could argue that that house was fit for a child to live in."

We have independently reviewed Bazille's testimony regarding the inspection and State's Exhibits 1 through 20. In general, the areas depicted show considerable filth and substantial clutter throughout the mobile home with some mildew and/or mold in and around the toilet, bathtub, bathroom flooring, and some walls. Of particular concern are holes in the walls which reveal a pipe, a large hole in a ceiling, and an electrical cord dangling from a smaller hole in the ceiling.

Bazille informed Mother and Father of what should be fixed and cleaned up inside the home prior to the termination hearing. The district court warned the parents at previous hearings that failure to get the home in a livable condition would result in

17

terminating their rights. In short, the parents were on notice of what needed to be done. Considered in its totality, the evidence supports the district court's factual findings and legal conclusion with regard to K.S.A. 2017 Supp. 38-2269(b)(8).

*Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home, K.S.A. 2017 Supp. 38-2269(c)(3)*

As mentioned earlier, the district court found a third factor, K.S.A. 2017 Supp. 38-2269(c)(3), was also applicable in establishing parental unfitness. In the language of the statute, the district court found that Mother and Father failed to carry out a reasonable plan approved by the court directed toward the integration of the children into the parental home. On appeal, Mother and Father do not raise K.S.A. 2017 Supp. 38-2269(c)(3) or brief it as an appealable issue. Similarly, the State does not mention or address this factor.

As is apparent from the statutory language, K.S.A. 2017 Supp. 38-2269(c)(3) is related to the other two statutory factors that the parents have contested on appeal. For the sake of completeness, we have considered the district court's legal conclusion with regard to the applicability of K.S.A. 2017 Supp. 38-2269(c)(3) to the facts of this case.

The critical requirement of the case plan in this proceeding was that Mother and Father maintain a safe and livable home for their children. Given the clear and convincing evidence discussed with regard to K.S.A. 2017 Supp. 38-2269(b)(7) and (8), we hold the district court did not err in also concluding there was clear and convincing evidence to establish parental unfitness under K.S.A. 2017 Supp. 38-2269(c)(3) as well.

*Foreseeable Future*

Having found clear and convincing evidence to support the district court's finding of parental unfitness under K.S.A. 2017 Supp. 38-2269(b)(7), (b)(8), and (c)(3) we next

18

consider whether there was clear and convincing evidence to support the district court's finding that the conduct or conditions which rendered the parents unfit are unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a).

On appeal, Mother and Father claim they made improvements in the structural integrity, appliances, and cleanliness of the home. They challenge the district court's legal conclusion that any unfitness was unlikely to change in the foreseeable future. The parents state: "No regression was proven, just that by the standards of KVC, the parents['] home improvement skills were not ultra fast." The State counters: "The inability of the parents to make the house livable over a period of almost eighteen months gave [the district court] ample reason to believe that nothing would change in the foreseeable future."

Kansas law provides that children experience the passage of time differently than adults. See K.S.A. 2017 Supp. 38-2201(b)(4). As our court has written: "In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009).

As a result, the test is not whether Mother and Father were making reasonable steps towards carrying out the case plan, meeting the needs of the children, and reintegrating the family but whether the parents have the ability to actually accomplish—in the foreseeable future—the necessary goal of reunification.

In considering the question of the foreseeable future, a court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). In finding the conduct or conditions which rendered Mother and

19

Father unfit were unlikely to change in the foreseeable future, the district court relied on the parents' history as a guide:

> "So two and a half months, almost three full months after the filing of the [termination] motion, on July 3rd, this is the status of the house. Okay. And so that speaks more to the ongoing and the—the ability of the parents to do anything about this.
>
> . . . .
>
> "And so the argument goes, 'Judge, these things are all fixable. . . . [T]his house can be cleaned up. The odor can be gotten rid of. The mold can be gotten rid of. We can clean. We can do all of those things. So don't [terminate] now.'
>
> "But that has been the status quo for the last year . . . .
>
> ". . . We're a year and a half in of these kids being out of the house because the house is unlivable."

KVC and the district court told the parents on several occasions what needed to be accomplished in order to make the home safe and livable. While Mother and Father testified that lack of money prevented them from making all the changes to the home, the district court observed that cleaning and decluttering the home involved minimal cost. Moreover, the district court was more concerned with the parents' emotional and relationship issues. Despite family therapy, psychological evaluations, and repeated warnings of future termination, the home's condition did not appreciably improve. Given that Mother believed the home was safe and habitable at the time of the inspection, it is unlikely she would have any reason to remedy the situation in the foreseeable future. And overriding all of these considerations is the fact that a year and a half is a long time in a child's eyes. See *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

Based on their past history, there was clear and convincing evidence that Mother and Father were unlikely to change their conduct or condition of unfitness in the foreseeable future.

20

*Best interests of the children*

On appeal, Mother and Father contend "the district court gave no consideration to the physical, mental, or emotional needs of the children and it was an abuse of discretion to find that termination was appropriate." The State counters that the district court "gave primary consideration to the physical, mental, and emotional health of the children in its decision to terminate parental rights."

On appeal, our court reviews a district court's decision regarding best interests for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). An abuse of discretion occurs when no reasonable person would agree with the district court or if the court bases its decision on an error of fact or law. 50 Kan. App. 2d 1105, Syl. ¶ 2.

The district court found by a preponderance of evidence that termination of parental rights was in the best interests of A.Z. and P.Z. See K.S.A. 2017 Supp. 38-2269(g)(1). In making this determination, the court gives primary consideration to the physical, mental, and emotional needs of the children. K.S.A. 2017 Supp. 38-2269(g)(1).

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

When A.Z. and P.Z. were initially adjudicated as children in need of care, Mother and Father stipulated that the home was unsafe for the children, the children had hygiene issues, and they were the subject of previous CINC cases. In terminating the parents'

21

rights, the district court stated it gave primary consideration to the physical, mental, and emotional needs of the children and based its decision on the same factors used in finding the parents unfit.

At the termination hearing, Bazille testified that she was concerned about the ability of Mother and Father to care for A.Z. and P.Z. given that the children have special needs and the parents function at a low level. The caseworkers testified that given the inhabitable condition of the home, the children could be harmed or become sick.

Additionally, Mother and Father expressed concern to Bazille that P.Z. is on a path towards jail because he steals other people's property. Since the children have been removed from the home, however, reports have shown an improvement in academics, hygiene, and overall attitude. Still, over the course of this case, A.Z. and P.Z. have been placed in numerous temporary placements. While there was evidence of the children's positive relationship with their parents, the record reflects a need for permanency in the children's lives.

The district court repeatedly emphasized the safety and health concerns of the children throughout these proceedings. Because the record reflects evidence that the children's health and safety would be at risk if parental rights were not terminated, a reasonable person could agree with the district court's decision. We find no legal or factual error. The district court did not abuse its discretion in ruling that termination of parental rights was in the best interests of A.Z. and P.Z.

Affirmed.